# EXHIBIT A

# WAREHOUSE LEASE

THIS WAREHOUSE LEASE ("**Lease**"), is made as of the _____ day of October, 2023, by and between 1735 Jersey Ave LLC, a New Jersey Limited Liability Company, having an address at 275 Madison Avenue, 3rd Floor, New York, NY 10016 ("**Landlord**") and Luxe Living Design, LLC, a New York limited liability company, having an address at 3610 Quentin Road, Brooklyn, New York 11234 ("**Tenant**").

## ARTICLE I
## DEFINITIONS

**Section 1.01   Definitions.** The terms defined in this ARTICLE I shall have the following meanings whenever used in this Lease:

"**Additional Rent**" shall mean all monetary obligations, other than Base Rent, of Tenant to Landlord under the terms of this Lease, whether or not specified as Additional Rent herein, including, but not limited to, use and occupancy, holdover occupancy rent after lease termination or expiration, Tenant's payments of Operating Expenses and Real Estate Taxes, Tenant's payments for services, late fees, insufficient fund charges for bounced checks, overtime excess service charges, damages, interest, reasonable attorneys' fees, and other costs related to Tenant's failure to perform any of its obligations under this Lease.

"**ADA**" shall mean the Americans with Disabilities Act of 1990, (42 U.S.C. §§ 12101 to 12213), as amended by the Americans with Disabilities Act Amendments of 2008 (Pub. L. No. 110-325).

"**Affiliate(s)**" shall mean any partners, joint venturers, shareholders, parent company, subsidiary, property managers, directors, officers of a Person or entity, any entity that directly or indirectly is in Control of, is Controlled by, or is under common Control with such Person or entity.

"**Alteration(s)**" shall mean any change, alteration, addition, or improvement to the Premises, or the Building.

"**Arbitration**" shall mean in such cases where this Lease expressly provides for the settlement of a dispute or question through arbitration, and only in such cases, each party shall promptly appoint a Qualified Appraiser as an arbitrator on its behalf and shall give notice thereof to the other party. The two (2) Qualified Appraisers shall together appoint a third Qualified Appraiser within 15 Business Days after the appointment of Landlord's and Tenant's Qualified Appraisers, and said three (3) Qualified Appraisers shall, within the applicable time period specified in this Lease, or if no time period is specified, as promptly as possible, determine the matter which is the subject of the arbitration and the decision of the majority of them shall be a conclusive, final, non-appealable decision binding on all parties and judgment upon the award may be entered in any court having jurisdiction. The arbitration shall be conducted in the offices of the American Arbitration Association in the Township of Piscataway, County of Middlesex, State of New Jersey and, to the extent applicable and consistent with this Lease, shall be in accordance with the Commercial Arbitration Rules of the American Arbitration Association or any successor body of similar function. The expenses of Arbitration shall be shared equally by Landlord and Tenant but each party shall be responsible for the fees and disbursements of its own attorneys and the expenses of its own proof.

Landlord and Tenant shall sign all documents and do all other things necessary to submit any such matter to arbitration and further shall, and hereby do, waive any and all rights they or either of them may at any time have to revoke their agreement hereunder to submit to arbitration and to abide by the decision rendered thereunder. The arbitrators shall have no power to vary or modify any of the provisions of this Lease and their jurisdiction is limited accordingly.

"**Base Rent**" shall have the meaning set forth in Section 3.01 hereof.

"**Binding Renewal Notice**" shall have the meaning set forth in Section 27.03 hereof.

"**Brokers**" shall mean, collectively, Landlord's Broker and Tenant's Broker.

"**Building**" shall mean the warehouse improvement[s] in which the Premises are located, having a street address of 1735 Jersey Avenue, in the Township of North Brunswick, County of Middlesex, State of New Jersey.

"**Business Day(s)**" shall mean all days, excluding the following days: Saturdays, Sundays, and all days observed as legal holidays by the State, the Federal Government, and/or by any labor unions servicing the Building.

"**Certificate of Occupancy**" shall mean a certificate of occupancy or similar document or permit (whether conditional, unconditional, or permanent) that must be obtained from the appropriate governmental authority as a condition to Tenant's lawful occupancy of the Premises issued by the building department of the Township of North Brunswick, County of Middlesex, New Jersey, certifying that the Premises have been improved in compliance with all applicable Laws and the Premises are in a condition suitable for occupancy.

"**Commencement Date**" shall mean December 1, 2023.

"**Common Areas**" shall mean all areas and facilities located outside of the Premises that are provided and designated by Landlord from time to time for the general nonexclusive use of Landlord, Tenant, and other tenants of the Building, and their respective employees, suppliers, shippers, customers, contractors, and invitees, including, without limitation, parking areas, loading and unloading areas, trash areas, lighting facilities, fences and gates, roadways, sidewalks, walkways, parkways, driveways, signs, and landscaped areas.

"**Common Areas and Building Work**" shall have the meaning set forth in Section 2.06 hereof.

"**Control**" shall have the meaning set forth in Section 14.05(a) hereof.

"**Embargoed Person**" shall have the meaning set forth in Section 26.19 hereof.

"**Environmental Laws**" shall mean all Laws: (a) relating to the environment, human health, or natural resources; (b) regulating, controlling, or imposing liability or standards of conduct concerning any Hazardous Materials; (c) relating to Remedial Action; and (d) requiring notification or disclosure of a Release of Hazardous Materials or of the existence of any environmental conditions on or at the Premises, as any of the foregoing may be amended, supplemented, or supplanted from time to time. Environmental Laws shall include, but not be limited to, the following: the Comprehensive Environmental Response

Compensation and Liability Act of 1980, 42 U.S.C. 9601 *et seq.*, ("**CERCLA**"); the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 *et seq.*, ("**ISRA**"); the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 *et seq.*, ("**Spill Act**"); the Solid Waste Management Act, N.J.S.A. 13:1E-1 *et seq.*, ("**SWMA**"); the Resource Conservation and Recovery Act, 42 U.S.C. 6901 *et seq.*, ("**RCRA**"); the New Jersey Underground Storage of Hazardous Substances Act, N.J.S.A. 58:10A-21 *et seq.*, ("**USTA**"); the Clean Air Act, 42 U.S.C. Section 7401 *et seq.*, ("**CAA**"); the Air Pollution Control Act, N.J.S.A. 26:2C-1 *et seq.*, ("**APCA**"); and the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A-1 *et seq.*, ("**WPCA**"). For purposes of Environmental Laws, to the extent authorized by law, Tenant is and shall be deemed to be the responsible party, including without limitation, the "owner" and "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by Tenant, its agents, employees, contractors, or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

"**Event(s) of Default**" shall have the meaning set forth in Section 18.02 hereof.

"**Executive Order**" shall have the meaning set forth in Section 26.19(a) hereof.

"**Expiration Date**" shall mean the last day of the month in which occurs the Eighty-Six (86) Months following the anniversary of the Commencement Date, as same may be renewed pursuant to ARTICLE XXVII hereof, or such earlier date on which the Term shall sooner end pursuant to any of the terms, covenants, or conditions of this Lease or pursuant to Law.

"**Force Majeure Event**" means any of the following events: (a) acts of God; (b) hurricanes, northeasters, floods, fires, earthquakes, explosions, or other natural disasters; (c) war, invasions, hostilities (whether war is declared or not), terrorist threats or acts, riots or other civil unrest; (d) proclamations, orders, laws, actions, or requests made or enacted by governmental authorities; (e) embargoes or blockades; (f) epidemics, pandemics, or other national or regional public health emergencies; (g) strikes, labor stoppages or slowdowns, or other industrial disturbances; and (h) shortages of supplies, adequate power, or transportation facilities.

"**GAAP**" shall mean US generally accepted accounting principles in effect from time to time.

"**Gross-Up Estimate of Operating Expenses**" shall have the meaning set forth in Section 4.07 hereof.

"**HVAC**" shall have the meaning set forth in Section 10.02 hereof.

"**Hazardous Materials**" shall mean any pollutant, contaminant, or hazardous, dangerous, or toxic chemicals, materials, or substances within the meaning of any applicable Environmental Law relating to or imposing liability or standards of conduct concerning any hazardous, toxic, or dangerous waste substance or material, all as amended or hereafter amended, including, without limitation, any material or substance which is: (a) designated as a "hazardous substance" pursuant to Section 311 of the Federal Water Pollution Control Act (33 U.S.C. § 1317) or equivalent State Laws, including WPCA and APA; (b) defined as a "hazardous waste" pursuant to § 1004 of the RCRA or equivalent State Laws; (c) defined as a "hazardous substance" pursuant to Section 101 of CERCLA (42 U.S.C. § 9601) or equivalent State Laws, including ISRA, the Spill Act, the SWMA, and the USTA; (d) petroleum; (e) asbestos or asbestos-containing materials; (f) polychlorinated biphenyls ("**PCBs**") or substances or compounds containing PCBs; (g) radon; (h) medical waste; and (i) petroleum products.

"**Initial Renewal Notice**" shall have the meaning set forth in Section 27.01(a) hereof.

"**Interest Rate**" shall mean the twelve percent (12 %) *per annum* but, in no event, in excess of the maximum permissible interest rate then in effect in the State.

"**Land**" shall mean all that certain plot, piece, or parcel of land on which the Building is located.

"**Landlord**" shall mean the entity specified in the first paragraph of this Lease and any successor or assign of such entity, subject to Section 26.10.

"**Landlord's Transferee Requirements**" shall have the meaning set forth in Section 6.03 hereof.

"**Landlord Parties**" shall have the meaning set forth in Section 15.07 hereof.

"**Landlord's Broker**" shall mean Cushman & Wakefield.

"**Landlord's Operating Expenses Statement**" shall have the meaning set forth in Section 4.05 hereof.

"**Law(s)**" shall mean all laws, statutes, and ordinances (including building codes, zoning ordinances, and regulations), rules, orders, directives, and requirements of all federal, State, NJDEP, county, municipal departments, bureaus, boards, agencies, offices, commissions, and other subdivisions thereof, or of any official thereof, or of any governmental, public or quasi-public authority, whether now or hereafter in force, which may be applicable to the Land, the Building, or the Premises, or any part thereof, including, without limitation, the ADA, the OSH Act, and any and all Superior Instruments.

"**Lease**" shall have the meaning set forth in the first paragraph of this document.

"**Lease Renewal Amendment**" shall have the meaning set forth in Section 27.03(c) hereof.

"**Letter of Credit**" shall have the meaning set forth in Section 6.02 hereof.

"**Memorandum of Lease**" shall have the meaning set forth in Section 26.17 hereof.

"**NJDEP**" shall mean the New Jersey Department of Environmental Protection Agency.

"**Noncontrollable Expenses**" shall mean Landlord's costs of insuring the Building and its interest therein (including any "deductible" cost incurred in connection with any covered loss), and the cost of utilities, security, and snow and ice removal for the Building Complex.

"**Noticing Party**" shall have the meaning set forth in Section 26.20 hereof.

"**Operating Expenses**" shall have the meaning set forth in Section 4.01 hereof.

"**OSH Act**" shall mean the Occupational Safety and Health Act (29 U.S.C. §§ 651 to 678), as amended from time to time.

"**Patriot Act**" shall have the meaning set forth in Section 26.19(a) hereof.

"**Person(s) or person(s)**" shall mean any natural person or persons, a limited liability company, a limited partnership, a partnership, a corporation, and any other form of business or legal association or entity.

"**Personal Property**" shall mean all tangible personal property now or at any time hereafter located on or at the Premises or used in connection with the Premises, including, without limitation, all trade fixtures, machinery, appliances, furniture, equipment, and inventory.

"**Permitted Use**" shall mean general warehouse use and ancillary uses (e.g. administrative offices) and for such other lawful purposes as may be incidental thereto, but no other use or purpose.

"**Premises**" shall mean approximately One Hundred Ninety-Five Thousand Seven Hundred Eighty-Two (1945,782) square feet located in the Building, consisting of One Hundred Ninety-Three Thousand Two Hundred Eighty-Two (193,282) square feet known as the front section of the Building and Two-Thousand Five Hundred (2,500) square feet of office space, including all improvements therein or to be provided by Landlord under the terms of this Lease, and being the space identified on <u>Exhibit A</u> attached hereto and made a part hereof. Tenant acknowledges that in determining the number of square feet of space in the Premises, all distances have been measured from the exterior face of all exterior walls and the center of all partition walls that separate the Premises from any interior area.

"**Prevailing Market Rental Rate**" shall have the meaning set forth in Section 27.04 hereof.

"**Prevailing Party**" shall have the meaning set forth in Section 26.18 hereof.

"**Primary Lease Term**" shall mean the initial term of this Lease beginning on the Commencement Date and ending on the Expiration Date.

"**Prime Rate**" shall mean the prime or base rate announced as such from time to time by the Wall Street Journal, and if not available, a comparable rate announced by another national bank selected by Landlord. Any interest payable under this Lease with reference to the Prime Rate shall be adjusted on a daily basis, based upon the Prime Rate in effect at the time in question, and shall be calculated on the basis of a 360-day year with twelve (12) months of thirty (30) days each.

"**Prohibited Person**" shall have the meaning set forth in Section 26.19(a) hereof.

"**Property Manager**" shall mean Saadia Group LLC.

"**Punch List Items**" shall mean the minor construction work that Landlord must complete for the Premises.

"**Qualified Appraiser**" shall mean an arbitrator that: (a) is duly licensed in New Jersey; (b) has at least Ten (10) years' experience, on a full-time basis, leasing industrial space in the same general geographic area as that in which the Premises are located, and at least Five (5) of those Ten (10) years of experience; and (c) is independent and has no then-pending or past brokerage relationship with any or all of Landlord, Tenant, and any Affiliates of either or both of Landlord and Tenant.

"**Quiet Enjoyment**" shall have the meaning set forth in ARTICLE XXIV hereof.

"**Real Estate Taxes**" shall mean any form of real estate tax or assessment, general, special, ordinary, or extraordinary imposed upon the Building, the Land, or any portion thereof by any authority having the direct or indirect power to tax, including any city, state, or federal government, or any school, sanitary, fire, street, drainage, or other improvement district thereof, levied against any legal or equitable interest of Landlord in the Building Complex, the Land, or any portion thereof. The term "Real Estate Taxes" shall also include any tax, fee, levy, assessment, or charge, or any increase therein, imposed by reason of events occurring, or changes in applicable zoning, municipal, county, state, and federal Laws, ordinances, and regulations, and any covenants or restrictions of record taking effect during the Term of this Lease, including but not limited to a change in ownership of the Building Complex, the Land, or the improvements thereon (or any portion thereof), the execution of this Lease, or any modification, amendment, or transfer thereof, and whether or not contemplated by the parties hereto.

"**Rejection Notice**" shall have the meaning set forth in Section 27.03(a) hereof.

"**Release**" shall have the meaning set forth in Section 8.01(a) hereof.

"**Remedial Action**" shall mean the investigation, response, clean up, remediation, prevention, mitigation, or removal of any Hazardous Materials necessary to comply with any Environmental Laws.

"**Renewal Option**" shall have the meaning set forth in Section 27.01 hereof.

"**Renewal Lease Term**" shall have the meaning set forth in Section 27.01 hereof.

"**Rent**" shall mean Base Rent and Additional Rent collectively.

"**Rent Commencement Date**" shall mean the date that is Two (2) months after the Commencement Date.

"**Rent Payment Address**" shall mean 275 Madison Avenue, 3rd Floor, New York, NY 10016.

"**Security Deposit**" shall have the meaning set forth in Section 6.01 hereof.

"**State**" shall mean the State of New Jersey.

"**Structural Alterations**" shall mean any Alterations involving the structural, mechanical, electrical, plumbing, fire/life safety, heating, ventilating, and air-conditioning systems of the Premises and/or the Building.

"**Substantially Destroyed**" shall have the meaning set forth in Section 16.02(a) hereof.

"**Superior Instruments**" shall mean any reciprocal easement, covenant, restriction, restriction of easement, condominium documents, association requirements, or other agreement of record affecting the Land and/or the Building Complex as of the date of this Lease or subsequent thereto.

"**Tenant**" shall mean the entity identified in the first paragraph of this document.

"**Tenant Improvements**" shall mean Alterations to the Premises performed by or on behalf of Tenant.

"**Tenant's Broker**" shall mean Cushman & Wakefield.

"**Tenant's Contractor**" shall have the meaning set forth in Section 2.03(b) hereof.

"**Tenant Parties**" shall have the meaning set forth in Section 15.07(b) hereof.

"**Tenant's Percentage**" shall mean Fifty-Four and 54/100 percent (54.54%) as the percentage derived by dividing the approximate square feet of the square feet in the Premises by the approximate square feet in the Building.

"**Tenant's Share of Operating Expenses**" shall mean Tenant's proportionate share of Operating Expenses based on the Tenant's Percentage.

"**Tenant's Share of Real Estate Taxes**" shall mean Tenant's proportionate share of Real Estate Taxes based on the Tenant's Percentage.

"**Term**" shall mean the Primary Lease Term and the Renewal Lease Term (provided Tenant is entitled to and properly exercises the Renewal Option).

"**Transfer**" shall have the meaning set forth in Section 14.01 hereof.

## ARTICLE II
## PREMISES

**Section 2.01   Lease of Premises for Lease Term.** In consideration of the obligation of Tenant to pay Rent as herein provided, and subject to the terms, covenants, and conditions of this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises to have and to hold for the Primary Lease Term (as such Primary Lease Term may be extended or renewed pursuant to Article XXVII hereof), subject to earlier termination pursuant to any of the terms, covenants, or conditions of this Lease or pursuant to Law. Landlord shall deliver the Premises to Tenant on the Commencement Date clean and free of debris and with Landlord's work substantially completed to the reasonable satisfaction of Tenant. Prior to the Commencement Date, Landlord shall repair any and all existing and/or active roof leaks above the Premises so that the Premises are fully dry.  Further, Landlord shall repair the roof as needed and represents that it will (in a timely manner) or has engaged a licensed contractor to do same.  Tenant shall inspect and approve of the Premises prior to the Commencement Date. Landlord and Tenant agree that the Commencement Date is expected to occur on the Commencement Date.  Landlord shall advise Tenant of the Commencement Date in writing at least ten (10) Business Days prior thereto.  Promptly after the Commencement Date, Landlord and Tenant shall work together in good faith to execute a commencement date agreement in the form attached hereto as <u>Exhibit B</u> acknowledging the Commencement Date and the Expiration Date for the Primary Lease Term. Failure by either party to execute a commencement date agreement shall not constitute an Event of Default under this Lease.  The Parties acknowledge and agree that the Primary Lease Term is seven (7) years and two (2) months commencing on the Commencement Date with the (a) first two months of Base Rent being abated. If there shall be an Event of Default (continuing beyond any and all applicable grace, notice, and cure periods) at any time during the Lease, Tenant shall forfeit its rights to any rent abatement, and shall immediately repay to Landlord the Base Rent for the months previously abated.

**Section 2.02   Acceptance of Premises.** Tenant hereby acknowledges that except as expressly set forth in this Lease: (a) Tenant has had the opportunity to inspect the Premises and accepts the Premises in their "AS IS, WHERE IS" condition; (b) the Premises is acceptable for Tenant's intended Permitted Use; (c) neither Landlord, Landlord's Broker, nor any of Landlord's agents, has made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease; and (d) TENANT EXPRESSLY WAIVES ANY WARRANTY OF CONDITION OR OF HABITABILITY OR SUITABILITY FOR OCCUPANCY, USE, HABITATION, FITNESS FOR A PARTICULAR PURPOSE, OR MERCHANTABILITY, EXPRESS OR IMPLIED, RELATING TO THE PREMISES.

**Section 2.03   Delay in Commencement.** Landlord and Tenant presently anticipate that possession of the Premises will be tendered to Tenant in the condition required by this Lease including Landlord's Initial Work being substantially completed, on the Commencement Date.  If Landlord is unable to tender possession of the Premises in the condition required under this Lease to Tenant by the Commencement Date, then Base Rent shall abate, per diem, and the Term shall continue to extend on a one-day extension from and after the Commencement Date and continuing until Tenant takes possession of the Premises, in order to account for each day that the Commencement Date fails to occur.  Without limiting the foregoing, if the Commencement Date does not occur on or before December 1, 2023, then either party shall have the option to select an alternate Commencement Date, such date being no later than thirty days following the Commencement Date, in which event this Lease shall remain in full force and effect by providing  written notice to the other party. In the event Landlord still cannot deliver the Premises, Tenant shall, upon written notice to Landlord, have the right to terminate this Lease, in which event the Security Deposit and all prepaid Rent, if any, shall be immediately refunded to Tenant and the parties shall be released from their obligations hereunder.

**Section 2.04   Common Areas.** All parking areas, driveways, entrances and exits thereto, stairways, lobbies, and all other Common Areas provided by Landlord for the general use in common by all tenants in the Building shall be at all times subject to the exclusive control and management of Landlord.  Landlord hereby grants to Tenant for the benefit of Tenant and its employees, suppliers, shippers, customers, contractors, and invitees, during the Term of this Lease, the nonexclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Landlord under the terms hereof or under the terms of any Rules and Regulations and Superior Instruments governing the use of the Building Complex. Under no circumstances shall the right granted herein be deemed to include the temporary or permanent right to store any property in the Common Areas. Landlord shall have the right, from time to time, to: (a) establish, modify, amend, and enforce the Rules and Regulations regarding the Common Areas; (b) make changes to the Common Areas, including, without limitation, changes in the location, size, shape, and number of driveways, entrances, ingress, egress, direction of traffic, parking spaces, parking areas, loading and unloading areas, landscaped areas, and walkways, so long as reasonable access to the Premises remains available; (c) close temporarily any of the Common Areas for maintenance purposes, so long as reasonable access to the Premises remains available; (d) add additional buildings and improvements to the Common Areas; and (e) do and perform such other acts and make such other changes in, to, or with respect to the Common Areas and the Building Complex as Landlord may, in the exercise of sound business judgment, deem to be appropriate (collectively, "**Common Areas and Building Complex Work**").

**Section 2.05   Pre-Commencement Entry by Tenant**. Tenant may, prior to the Commencement Date (but following coordination with Landlord as to the timing and availability), enter the Premises (or such portions thereof as designated by Landlord), without payment of Rent or an Additional Rent, but

otherwise subject to all the terms and conditions of this Lease, for the purpose of inspecting the Premises, taking measurements, and/or installing Tenant's furniture, fixtures and equipment ("**Tenant's Early Entry**"), provided that (a) Tenant shall not interfere with any work then being performed by or for Landlord in the Premises or Building or (b) Tenant shall immediately cease its activities in the Premises in the event that Landlord notifies Tenant (which notice may be given orally) that Tenant is interfering with the work being performed by or for Landlord. All such work done during Tenant's Early Entry shall be done in accordance with, and Tenant shall comply with, the provisions of this Lease. Nothing contained herein shall permit Tenant to store any inventory in the Premises prior to the Commencement Date.

**Section 2.06   Continued Commercial Occupancy Certificate Contingency**. If required by the Borough of Middlesex, the Commencement Date shall not commence until Tenant receives its Continued Commercial Occupancy Certificate (the "CCOC") from the Borough of Middlesex. As soon as reasonably possible, but at least ten (10) days prior to but not more than thirty (30) days prior to the change of occupancy at the Premises, Tenant shall file the requisite application with the Borough of Middlesex, Department of Code Enforcement, Zoning, and Construction. Landlord shall reasonably cooperate with and assist Tenant in securing the CCOC. So long as Landlord reasonably cooperates and assists Tenant in security the CCOC, Tenant shall have no right to terminate the Lease by reason of delay in commencement as set forth in Section 2.03.

### ARTICLE III
### PAYMENT OF BASE RENT AND ADDITIONAL RENT

**Section 3.01   Base Rent.**

(a)    Tenant covenants and agrees to pay base rent ("**Base Rent**") to Landlord throughout the Primary Lease Term of this Lease as follows:

(i)    For the period commencing on the Commencement Date and ending One (1) year thereafter, an amount equal to Two Million Four Hundred  Forty-Seven Thousand Two Hundred Seventy-Five and 00/100 Dollars ($2,447,275) *per annum* and Two Hundred Three Thousand Nine Hundred Thirty Nine  and 58/100 Dollars ($203,939.58) per month; and

(ii)    The Base Rent shall increase on the yearly anniversary of the Commencement Date by Four Percent (4%).

(b)    If Tenant is entitled to and properly exercises its Renewal Option in accordance with the terms of Article XXVII of this Lease, the Base Rent payable with respect to the Renewal Lease Term shall be an amount as determined pursuant to Section 27.02 hereof.

**Section 3.02   Time and Manner of Base Rent and Additional Rent Payments.**

(a)    Tenant shall pay February 2024 Base Rent to Landlord on or before December 1, 2023.

(b)      Beginning March 1, 2024, Tenant shall pay Base Rent to Landlord in equal monthly installments, in advance, commencing on the first (1st) day of each month during the Term, without notice, demand, deduction, or setoff.

(c)      Base Rent due for any period of less than twelve (12) months (or any monthly installment of Base Rent due for any period of less than a full month) shall be appropriately apportioned based upon a 360-day year (or based upon the number of days in such month).

(d)      Tenant shall pay to Landlord all Additional Rent that is payable to Landlord pursuant to the terms and conditions of this Lease within Ten (10) Business Days after written demand therefor from Landlord, unless a different time period is specified in this Lease.

(e)      All Rent shall be paid, without notice or demand, by wire transfer in accordance with wire instructions provided by Landlord to Tenant under separate instruction.

**Section 3.03   Late Payment.**

(a)      If any payment of Base Rent, Additional Rent, or any other charge or expense payable under this Lease is not received by Landlord within seven (7) days after its due date, such payment shall be subject to a late payment fee of seven percent (7%)) of the unpaid amount, or such lesser amount as may be the maximum amount permitted by Law, until such payment is received by Landlord.

(b)      If any payment of Base Rent, Additional Rent, or any other charge or expense payable under this Lease is not received by Landlord within Thirty (30) days of the applicable due date, Tenant shall pay to Landlord, as Additional Rent, in addition to the late charge described above, interest on the overdue amount to Landlord at the Interest Rate. Such overdue payment shall bear interest from the applicable due date, without regard to any grace period, until the date such payment is received by Landlord. Such payment shall be in addition to, and not in lieu of, any other remedy Landlord may have.

**ARTICLE IV**
**OPERATING EXPENSES**

**Section 4.01   Operating Expenses.** For purposes of this Lease, the term **"Operating Expenses"** shall mean any and all costs and expenses paid or incurred, without markup, by Landlord in connection with the management, operation, maintenance, and repair of the Building including, without limitation:

(a)      The cost of repairs, replacements maintenance, and cleaning, including, without limitation, the cost of snow, ice, trash, and debris removal.

(b)      The cost of all repairs and maintenance associated with the landscaped areas, roadways, sidewalks, parkways, driveways, Common Area lighting facilities, fences, gates, elevators, exterior paint, exterior signs, awnings, any tenant directories, and fire detection and sprinkler systems.   Where parties reasonably and in good faith conclude that repairs are insufficient, the costs of any replacements reasonably necessary for the proper and legal functioning of equipment.

(c)     The cost of water, gas, electricity, sewer service, and other systems and utilities for the Common Areas, and the cost of supplies, equipment, and maintenance and service contracts in connection therewith.

(d)     Property management fee (but only to the extent that such Property management fees are (i) directly performed at or for the Premises; and (ii) such Property management does not exceed three percent (3%)).

(e)     Premiums for the insurance policies maintained by Landlord.

(f)     The cost of supplies materials, used in the management, operation, maintenance, and repair of the Common Areas of Building, including, without limitation, any reasonable rental fees for any equipment.

(g)     Fees, costs, and disbursements incurred in connection with proceedings to contest, determine, or reduce Operating Expenses or Real Estate Taxes; provided, however, that Tenant is responsible for Tenant's Percentage if and only if such proceedings are successful.

(h)     Expenditures for capital improvements (including replacement of tenant's portion of the roof pursuant to Section 11.01 herein), structural repairs, and replacements that are: (i) required in order to conform to changes to any Laws after the date of this Lease; (ii) has the actual effect as a cost or labor saving device or to affect other economics in the operation of the Building; or (iii) determined by Landlord to be reasonably necessary or appropriate for the operation of the Building which shall be calculated each year by dividing the estimated cost of such item[s] by the estimated useful life of such item[s] at the Interest Rate, as reasonably determined by Landlord. Expenditures for capital improvements shall only be included so long as such cost/labor saving device actually lowers the costs of the Building's Operating Expenses as demonstrated by reasonable, written, and verifiable evidence.

All such Operating Expenses shall be recorded on an accrual basis and in accordance with acceptable principles of sound management and accounting practices applicable to similar projects in the same geographical area as that in which the Building is located and in accordance with GAAP.

**Section 4.02   Operating Expenses Exclusions.** Operating Expenses shall specifically exclude the following costs and expenses incurred by Landlord:

(a)     All Real Estate Taxes and transfer, gains, inheritance, estate, occupancy, succession, gift, corporation, unincorporated business, gross receipts, franchise, or income taxes imposed upon Landlord.

(b)     The costs of complying with any Laws enacted prior to the Commencement Date.

(c)     Any fines, costs, late charges, liquidated damages, penalties, tax penalties, or related interest charges imposed on Landlord or Landlord's managing agent.

(d)     Any reserves of any kind.

(e)     Expenses in connection with services or other benefits which are provided directly and exclusively to another tenant or occupant of the Building and that do not benefit Tenant.

(f)     Expenses (including insurance deductibles) for repair, replacements, and general maintenance of portions of the Building which are paid by proceeds of insurance or by Tenant or other third parties.

(g)     Alterations attributable solely to tenants of the Building other than Tenant

(h)     Interest, amortization, or other payments on loans made to Landlord, whether secured or unsecured; secured loan amortization and interest; costs relating to acquiring or negotiating equity contributions; costs and charges incurred in obtaining any public or private financing, refinancing, or loan modifications.

(i)     Depreciation of the Building.

(j)     Leasing commissions.

(k)     Ground rent and related costs in connection with Landlord's ground lease (if any) of the Land.

(l)     Any costs, fees, dues, contributions, or similar expenses for political, charitable, industry association, or similar organizations, as well as the cost of any newspaper, magazine, trade, or other.

(m)     All advertising and promotional costs including any form of entertainment expenses, dining expenses, any costs relating to tenant or vendor relation programs including flowers, gifts, luncheons, parties, and other social events, but excluding any cost associated with life safety information services and other like property management events.

(n)     Any costs relating to the marketing, solicitation, negotiation, and execution of leases of space in the Building, including without limitation, promotional and advertising expenses, commissions, finders' fees, referral fees, legal fees, and expenses relating to the negotiation and preparation of any lease, sublease, or other occupancy document, tenant improvement costs for tenant or other occupant space, the amount of any allowances or credits paid or granted to tenants or other occupants of any such design or construction, and all other costs of alterations of space in the Building leased to or occupied by other tenants or occupants.

(o)     Wages, salaries, fees, fringe benefits, and any other forms of compensation paid to any executive employee of Landlord and/or Landlord's managing entities or partners above the grade of building manager, as such term is commonly understood in the property management industry; provided, however, all wages, salaries, and other compensation otherwise allowed to be included in Operating Expenses shall also exclude any portion of such costs related to any employee's time devoted to other efforts unrelated to the maintenance, accounting, management, and operation of the Building.

(p)     General corporate overhead for Landlord.

(q)     The costs of electrical energy furnished directly to other tenants of the Building, the costs and fees of any electrical meter reading company retained by Landlord to read meters that measure electrical energy, and the costs and expenses of providing any additional meters for space leased in the Building to third parties.

(r)     Costs incurred in connection with the acquisition or sale of air rights, transferable development rights, easements, or other real property interests.

(s)     Costs incurred by Landlord resulting from Landlord's, Landlord Parties', or another tenant's breach of the Lease, Landlord's or Landlord Parties' negligence or willful misconduct, or Landlord's indemnification of any tenant of the Building pursuant to the provisions of such tenant's lease.

(t)     Income, excess profits, franchise taxes, or other such taxes imposed or measured by the income of Landlord from the operation of the Building.

(u)     Any costs of Landlord retaining security (e.g. security guards) for the Building and/or the Premises.

**Section 4.03   Estimation of Tenant's Share of Operating Expenses.** No later than December 1 of each preceding year of the Lease, Landlord shall deliver to Tenant a written estimate of the following for each upcoming calendar year of the Term of this Lease: (a) Operating Expenses; (b) Tenant's Share of Operating Expenses; and (c) the annual and monthly Additional Rent attributable to Tenant's Share of Operating Expenses. Subject to Section 4.08 below, Landlord may re-estimate Operating Expenses from time to time during the Term of this Lease. In such event, Landlord shall re-estimate the monthly Additional Rent attributable to Tenant's Share of Operating Expenses to an amount sufficient for Tenant to pay the re-estimated monthly amount over the balance of the calendar year. Landlord shall notify Tenant of the re-estimate and Tenant shall pay the re-estimated amount in the manner provided in Section 4.04.

**Section 4.04   Payment of Estimated Tenant's Share of Operating Expenses.** Tenant shall pay the amount Landlord estimates as Tenant's Share of Operating Expenses under Section 4.03 as Additional Rent in equal monthly installments, in advance, commencing on the Commencement Date and thereafter on the first (1st) day of each and every calendar month during the Term of this Lease. Partial months shall be appropriately prorated. If Landlord has not delivered the estimates to Tenant by the first day of January of the applicable calendar year, Tenant shall continue paying Tenant's Share of Operating Expenses based on Landlord's estimates for the previous calendar year. When Tenant receives Landlord's estimates for the current calendar year, Tenant shall pay the estimated amount for such calendar year (less amounts Tenant paid to Landlord in accordance with the immediately preceding sentence) in equal monthly installments over the balance of such calendar year, with the number of installments being equal to the number of full calendar months remaining in such calendar year.

**Section 4.05   Confirmation of Tenant's Share of Operating Expenses.**

(a)     Within Thirty (30) days after the end of each calendar year (i.e., no later than January 30) within the Term of this Lease, Landlord shall determine the actual amount of Tenant's Share of Operating Expenses for the expired calendar year and deliver to Tenant a written statement of such amount ("**Landlord's Operating Expenses Statement**"). Subject to Section 4.08 below, if Tenant paid less than the amount of Tenant's Share of Operating Expenses specified

in Landlord's Operating Expenses Statement, Tenant shall pay the difference to Landlord as Additional Rent within Five (5) Business Days/ after invoice therefor.

(b)     If Tenant paid more than the amount of Tenant's Share of Operating Expenses specified in Landlord's Operating Expenses Statement, Landlord shall, at Landlord's option, either: (i) refund the excess amount to Tenant if such amount is more than one month's Base Rent; or (ii) if such amount is equal to or less than one month's Base Rent, credit the excess amount against Tenant's next due monthly installment of Base Rent. If the Term of this Lease has expired or has been terminated, Tenant shall pay the balance due to Landlord or, alternatively, Landlord shall refund the surplus to Tenant, whichever the case may be, within Five (5) Business Days after Tenant's receipt of Landlord's Operating Expenses Statement.

(c)     If Landlord is delayed in delivering Landlord's Operating Expenses Statement to Tenant, such delay shall not constitute Landlord's waiver of Landlord's rights under this Section 4.05.

**Section 4.06   Tenant's Inspection and Audit Rights.**

(a)     Landlord shall keep and maintain reasonably complete, legible, and accurate records of the Operating Expenses for a period of three (3) years from the date such Operating Expenses are incurred. If Tenant desires to audit Landlord's determination of the actual amount of Tenant's Share of Operating Expenses for any calendar year, including but not limited to Landlord's Gross-Up Estimate of Operating Expenses, Tenant shall deliver to Landlord written notice of Tenant's election to perform such audit within sixty (60) days after Landlord's delivery of Landlord's Operating Expenses Statement of such amount under Section 4.05 herein and/or Landlord's delivery of Landlord's Gross-Up Estimate of Operating Expenses. If such notice is timely delivered, Tenant (but not any subtenant) or its representatives may audit Landlord's records relating to such amounts. Such audit shall take place during regular business hours at a time and place reasonably acceptable to the parties (which may be the location where Landlord or Landlord's Property Manager maintains the applicable records). Tenant's election to audit Landlord's determination of Tenant's Share of Operating Expenses is deemed withdrawn unless Tenant completes and delivers the audit report to Landlord within Forty-Five (45) days after the date Tenant delivers its notice of election to audit to Landlord under this Section 4.06(a).

(b)     If the audit report shows that the amount Landlord charged Tenant for Tenant's Share of Operating Expenses was greater than the amount this Article IV obligates Tenant to pay, unless Landlord reasonably contests the audit, Landlord shall refund the excess amount to Tenant, together with interest on the excess amount within Five (5) Business Days after Landlord receives a copy of the audit report. If the audit report shows that the amount Landlord charged Tenant for Tenant's Share of Operating Expenses was less than the amount this Article IV obligates Tenant to pay, Tenant shall pay to Landlord, as Additional Rent, the difference between the amount Tenant paid and the amount determined in the audit. Pending resolution of any audit under this Section 4.06, Tenant shall continue to pay to Landlord all estimated amounts of Tenant's Share of Operating Expenses in accordance with Section 4.04. Tenant shall bear the cost of its audit.

(c)     Except for disclosures required by Law and as required for the audit by Tenant or Tenant's professional internal or third-party auditor, Tenant shall keep all information it obtains

in any audit confidential and may only use such information for the limited purpose this Section 4.06 describes and for Tenant's own account. If Landlord disputes such audit results, Landlord may contest the results by submitting the results of the audit to Arbitration. The decision of the arbitrator shall be binding on the parties.

**Section 4.07   Adjustments.** If all of the rentable area of the Building is not occupied at all times during any calendar year pursuant to leases under which the terms and rents have commenced for such calendar year or if a portion of the Building has not commenced business operations, Landlord will reasonably and equitably adjust its computation of Operating Expenses for that calendar year to include all components of Operating Expenses that vary based on occupancy or lack of operation (for example, management fees) in an amount equal to Landlord's reasonable estimate of the amount Landlord would have paid for such components of Operating Expenses had all of the rentable area of the Building been so occupied at all times during such calendar year assuming an average rental rate equal to the average rate under existing leases ("**Gross-Up Estimate of Operating Expenses**").

**ARTICLE V**
**TAXES**

**Section 5.01   Real Estate Taxes.** Tenant shall reimburse (with no markups) Landlord, as Additional Rent, for Tenant's Share of Real Estate Taxes.

**Section 5.02   Sales Taxes.** In addition to all Rent, Tenant shall pay the full amount of all sales, use, excise, and rental taxes levied, assessed, or payable for or on account of this Lease, or the rent payments contemplated by this Lease, or the rents and other sums of money payable under or by virtue of the Lease. Such payments shall be made directly to the taxing authority or to Landlord, as provided by Law.

**Section 5.03   Personal Property Taxes.** Tenant shall pay, prior to delinquency, all taxes charged against Tenant's Personal Property. Tenant shall use all reasonable efforts to have Tenant's Personal Property taxed separately from the Building Complex. If any of Tenant's Personal Property is taxed with the Building Complex, Tenant shall pay on demand from Landlord the taxes attributable to Tenant's Personal Property to Landlord as Additional Rent.

**Section 5.04   Landlord's Right to Contest Real Estate Taxes.** Landlord may, but is not obligated to, contest the amount or validity, in whole or in part, of any Real Estate Taxes. If Real Estate Taxes are reduced (or if a proposed increase is avoided or reduced) because Real Estate Taxes are contested, Landlord may include in its computation of Real Estate Taxes the reasonable costs and expenses incurred in connection with such contest, including without limitation reasonable attorneys' fees, up to the amount of any Real Estate Tax reduction obtained in connection with the contest or any Real Estate Tax increase avoided or reduced in connection with the contest, as the case may be; provided, Tenant is T only responsible for Tenant's Percentage of the reduced taxes. Tenant shall have the right to contest Real Estate Taxes at Tenant's sole cost and expense and Landlord shall reasonably cooperate with the same. Tenant shall be credited with its equitable share of any refund of Real Estate Taxes, using Tenant's Percentage, to the extent of the Real Estate Taxes actually paid by Tenant and, if applicable, such refund shall be made to Tenant within thirty (30) days after Landlord's receipt of the same.

**Section 5.05   Installments.** Notwithstanding any provision to the contrary contained herein, if Landlord is entitled to pay any of the above listed assessments or charges in installments over a period of two or more calendar years, then "Real Estate Taxes" for each year shall include only that portion of such assessments or charges that would be due within each year upon Landlord's election to pay the assessments or charges over the maximum period of time permitted, whether or not Landlord makes such election.

## ARTICLE VI
## SECURITY DEPOSIT

**Section 6.01   Security Deposit Amount.** Tenant shall (a) deposit with Landlord simultaneously with the execution of this Lease the sum of Five Hundred Thousand and 00/100 Dollars ($500,000.00), which is the equivalent of three (3) months Base Rent (the "**Initial Security Deposit**") and (b) deposit an additional sum of Three Hundred Thousand and 00/100 Dollars ($300,000.00), which is equivalent to two (2) months Base Rent, no later than two (2) months after the Commencement Date (the "**Additional Security Deposit**"), time being of the essence and no default *de minimis*, in lawful US currency (the Initial Security Deposit and the Additional Security Deposit shall collectively be known herein as the "**Security Deposit**"), for the faithful performance and observance by Tenant of the terms, provisions, and conditions of this Lease.  It is agreed that in the event that there is an uncured and continuing Event of Default by Tenant under this Lease after the expiration of any applicable notice and cure periods, Landlord may draw on such Security Deposit to the extent required for the payment of Rent or any other sum as to which Tenant is in default, or any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants, or conditions of this Lease. In the event that Landlord does draw on the Security Deposit, Tenant shall within thirty (30) days of receiving written notice from Landlord, replenish the Security Deposit by the amount Landlord withdrew therefrom and failure to do so within such thirty (30) day period shall constitute an Event of Default under this Lease. The failure to timely deliver the Additional Security Deposit shall constitute an uncurable default and Landlord shall be entitled to immediately exercise any and all remedies consistent with an Event of Default (hereinafter defined).

**Section 6.02   Security Deposit Transfer.** If Landlord transfers its interest in the Building during the Term of this Lease, Landlord shall assign the Security Deposit to the transferee and thereafter shall have no further liability for the return of such Security Deposit.

**Section 6.03   Return of Security Deposit.** If Tenant is not in default beyond any and all applicable notice and cure periods at the termination of this Lease, the balance of the Security Deposit remaining after any application of the Security Deposit (including under Section 25.01) shall be returned by Landlord to Tenant no later than the later of (x) thirty (30) days after the expiration of this Lease or (y) a final inspection of the Premises to be arranged at a mutually agreeable time to both Landlord and Tenant during the final month of the Lease Term following (i) removal of all of Tenant's furniture, fixtures, and equipment and (ii) Tenant performing any applicable restoration work.

## ARTICLE VII
## USE

**Section 7.01   Permitted Use.** Tenant shall use the Premises only for the Permitted Use and shall not use the Premises for any other purposes. Tenant shall not use the Building or permit the Premises to

be used in violation of any Law, or in a manner which reasonably annoys or interferes with the rights of other tenants of the Building, or which constitutes a nuisance or waste. Tenant shall obtain and pay for all permits, including a Continued Commercial Occupancy Certificate (Borough of Middlesex requirement), required for Tenant's occupancy of the Premises and shall promptly take and pay for all substantial and insubstantial actions necessary to comply with all Laws regulating the use by Tenant of the Premises, including, without limitation, the OSH Act and the ADA. Notwithstanding the foregoing, Tenant shall be permitted to use a paint booth on the Premises, as well as conduct touch-up painting on Tenant's product, in accordance with applicable law, including Environmental Laws, and municipal approval, if necessary.

**Section 7.02   Uses Prohibited.** Tenant shall not do or permit anything to be done in or about the Premises nor bring to or keep anything in or on the Premises that is not within the Permitted Use of the Premises or which will in any way increase the existing rate on or affect any fire or other insurance upon the Building or any of its contents, or cause a cancellation of any insurance policy or policies covering the Building or any part thereof or any of its contents. Tenant shall not conduct or give notice of any auction, liquidation, or going out of business sale at the Premises. Tenant shall not use the Building or permit the Premises to be used in violation of any Law, or in a manner which reasonably annoys or interferes with the rights of other tenants of the Building, or which constitutes a nuisance or excessive waste. Tenant also shall not permit any reasonably objectionable or unpleasant obnoxious  odors, smoke, dust, gas, excessive noise, or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance or would disturb, unreasonably interfere with, or endanger Landlord or any tenants of the Building Complex.

**Section 7.03   Signs.** Tenant shall not place any signs on the Premises without Landlord's prior written consent, such consent not to be unreasonably withheld, conditioned, or delayed.

**Section 7.04   Landlord's Access.**

(a)      Landlord or its agents may enter the Premises to inspect the Premises or to show the Premises to potential buyers, investors, or other parties, or for any other purpose Landlord deems commercially reasonable upon twenty-four (24) hour prior written notice to Tenant (email being acceptable). Tenant or its representatives shall have the opportunity to be present during such Landlord's access onto the Premises. Landlord shall at all times have and retain a key with which to unlock all the standard entrances and exit doors in, upon, and about the Premises, excluding Tenant's vaults, safes, and files. Landlord may place customary "For Sale" or "For Lease" signs on or about the Premises, but may not place such signs in or in front of the Premises until Six (6) months prior to the end of the Term of this Lease or if Tenant vacates the Premises prior to the expiration of the Term of this Lease.  Only within the six (6) months prior to the end of the Term of this Lease may Landlord show the Premises to potential tenants.  Notwithstanding anything contained herein to the contrary, Landlord shall be entitled to place customary "For Sale" or "For Lease" signs if Tenant shall be in default (beyond any grace, notice, and cure periods) of any of its material obligations of this Lease.

(b)      Landlord shall exercise all commercially reasonable efforts so that any entry into the Premises is reasonably designed to minimize interference with the operation of Tenant's business in the Premises.

**Section 7.05   Security.**  Notwithstanding the foregoing, Landlord is not responsible for the security of persons or property on or about the Premises and Landlord is not and will not be liable in any way whatsoever for any criminal activity or any breach of security on or about the Premises, unless the same is caused by Landlord's negligence or misconduct. Tenant shall be responsible for obtaining and maintaining all security with respect to the interior of the Premises, whether by the use of devices, security guard personnel, or otherwise.  Tenant acknowledges and agrees that Landlord shall have no liability to Tenant or its employees, agents, contractors, or invitees for the implementation or exercise of, or for the failure to implement or exercise, any security measures with respect to the interior of the Premises, the Building, or the Building Complex, unless the same is a direct result of Landlord's negligence or misconduct.

## ARTICLE VIII
## HAZARDOUS MATERIALS

**Section 8.01   Tenant Operations.**

(a)      Tenant shall not cause in, on, or under the Premises, or suffer or permit to occur in, on, or under, the Premises any generation, use, manufacturing, refining, transportation, emission, Release, treatment, storage, disposal, presence, or handling of Hazardous Materials, except that limited quantities of Hazardous Materials may be used, handled, or stored on the Premises, provided such limited quantities of Hazardous Materials are incident to and reasonably necessary for the maintenance of the Premises or Tenant's operations for its Permitted Use and are in compliance with all Environmental Laws. The term "**Release**" means spilling, leaking, pumping, pouring, discharging, emitting, emptying, ejecting, depositing, injecting, leaching, escaping, or dumping however defined, and whether intentional or unintentional, of any Hazardous Material.

(b)      Should a Release of any Hazardous Material occur at the Premises or the Building as a result of the acts or omissions of Tenant, or its employees, agents, suppliers, shippers, customers, contractors, or invitees, Tenant shall immediately contain, remove from the Premises or the Building, and/or properly dispose of such Hazardous Materials and any material contaminated by such Release, and remedy and mitigate all threats to human health or the environment relating to such Release, all in accordance with Environmental Laws.

(c)      Tenant, at its sole cost and expense, shall operate its business in the Premises and/or Building for its Permitted Use in strict compliance with all Environmental Laws and all requirements of this Lease. Tenant, at its own cost and expense, also agrees to comply with all applicable present Environmental Laws and any future environmental laws, rules and regulations of the Federal, State, County and Municipal governments and of all other governmental authorities having or claiming jurisdiction over the Premises and/or the Building or appurtenances thereto, or any part thereof, which are applicable to the Premises and/or the Building and/or the conduct of business thereon, including but not limited to ISRA.

(d)      Tenant and Landlord acknowledge and agree that pursuant to the provisions of ISRA, after the Commencement Date, the Tenant and any assignee or subtenant of Tenant shall be, and is hereby, designated the party responsible to comply with the requirements of ISRA that apply to Tenant's use and operations of the Premises. If Tenant's operations on the Premises and/or Building now or hereafter do not obligate Tenant to comply with ISRA, then prior to the expiration

or sooner termination of this Lease or any subletting of any portion of the Premises, Tenant shall, at Tenant's sole cost and expense, provide to Landlord such proof, reasonably satisfactory to Landlord, that confirms the proposed termination, assignment, or subletting is not subject to the requirements of ISRA. If Tenant's operations on the Premises and/or Building now or hereafter constitute an "Industrial Establishment" as that term is defined in ISRA then prior to: (i) closing operations or transferring ownership or operations of Tenant (as defined under ISRA) at the Premises; (ii) the expiration or sooner termination of the Lease; (iii) any assignment of the Lease or any subletting of any portion of the Premises; or (iv) any other event caused by Tenant which may trigger ISRA, then Tenant shall, at Tenant's sole cost and expense, comply with all requirements of ISRA pertaining thereto. Regarding any ISRA compliance proceeding, if the NJDEP determines that a remediation plan must be prepared and/or that clean-up must be undertaken because of any spills, discharges, or a Release of Hazardous Materials or wastes at the Premises and/or Building, which occur during the Term of this Lease, the Tenant shall, at Tenant's sole cost and expense, prepare and submit the required plans and financial assurances, and carry out the approved remediation plans. Without limitation of the foregoing, Tenant's obligations in connection with ISRA and this Lease shall include:

       (i)     The proper filing, with the NJDEP, of an initial notice under N.J.S.A. 13:1K-9(a);

       (ii)     The performance of all remediation and other requirements of ISRA, including without limitation all requirements of N.J.S.A. 13:1K-9(b) to 13:1K-9(l); and

       (iii)     The continuing obligation to pay Rent during all times under this Lease and until such time as the Tenant obtains and delivers to the Landlord a No Further Action Letter or Response Action Outcome as defined by ISRA (N.J.S.A. 13:1K-8), or such other proof, reasonably satisfactory to the Landlord, that the Premises and/or Building Complex comply without violation of ISRA.

       In the event of Tenant's failure to comply in full with the foregoing provisions, Landlord may, at its option perform any and all of Tenant's obligations set for in Section 8.01 and all reasonable costs and expenses incurred by Landlord in the exercise of this right shall be deemed to be Additional Rent payable on demand and with interest at the Interest Rate until full payment. Such costs and expenses include, but are not limited to, NJDEP fees, engineering fees, cleanup costs, filing fees, and suretyship expenses.

**Section 8.02   Permits and Documents.** Tenant, in a timely manner, shall, to the extent required due to Tenant's use of the Premises or arising out of Tenant's actions at the Premises or the Building, obtain and maintain in full force and effect all permits, licenses, and approvals, and shall make and file all notifications and registrations as required by Environmental Laws. Tenant shall at all times comply with the terms and conditions of any such permits, licenses, approvals, notifications, and registrations. Tenant also shall complete and certify to disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture, or Release of Hazardous Materials on the Premises and/or Building, and Tenant shall promptly deliver to Landlord a copy of any notice of violation relating to the Premises and/or Building of any Environmental Law requirements. Tenant shall provide copies of the following pertaining to the Premises or Tenant's use thereof, promptly after each shall have been submitted, prepared, or received by Tenant: (a) all notifications and associated materials

submitted to any governmental agency, including the NJDEP, relating to any Environmental Law; (b) all notifications, registrations, reports, and other documents and supporting information prepared, submitted, or maintained in connection with any Environmental Law or otherwise relating to environmental conditions; (c) all permits, licenses, and approvals, including any modifications thereof, obtained pursuant to any Environmental Law; and (d) any correspondence, notice of violation, summons, order, complaint, or other documents received by Tenant pertaining to compliance with or liability under any Environmental Law.

**Section 8.03   Inspection and Environmental Reports.** Upon not less than Twenty-Four (24) hours' prior written notice (except in the case of an emergency in which event Landlord shall provide written notice as soon as is practicable under the circumstances), Tenant agrees to permit Landlord and its authorized representatives to enter, inspect, and assess the Premises at reasonable times for the purpose of determining Tenant's compliance with the provisions of this Article VIII. Such inspections and assessments may include obtaining samples and performing tests of soil, surface water, ground water, or other media. Landlord may, at Landlord's sole option and sole expense, now or in the future, obtain a report from an environmental consultant of Landlord's choice as to whether Tenant has been or is currently using any part of the Premises for the improper use, handling, storage, transportation, or disposal of Hazardous Materials. If any such report indicates such improper use, handling, storage, transportation, or disposal of Hazardous Materials on the part of Tenant (or on behalf of Tenant), Tenant agrees to reimburse Landlord within thirty (30) days after receipt of an invoice and supporting documentation from Landlord for the cost of obtaining the environmental report, and, in addition, Landlord shall require that all violations of Environmental Law with respect to the Hazardous Materials be corrected and/or that Tenant obtain all necessary environmental permits and approvals.

**Section 8.04   Environmental Indemnification.**

(a)    Tenant hereby agrees to indemnify, defend, save, and keep Landlord, and Landlord's officers, principals, shareholders, partners, employees, successors, and assigns, harmless from and against any and all liabilities, obligations, charges, losses, damages, penalties, claims, actions, and expenses, including without limitation, engineers' and professional fees, soil tests, and chemical analysis, court costs, legal fees, and expenses through all trial, appellate, and administrative levels, imposed on, incurred by, or asserted against Landlord as a result of any breach of the requirements under this Article VIII, or in way relating to, arising out of, or in connection with the use, handling, storage, transportation, or disposal of Hazardous Materials by Tenant or its agents, employees, representatives, tenants, or contractors in, on, or about the Premises and/or the Building during the Term of this Lease. The foregoing indemnification shall survive any assignment or termination of this Lease.

(b)    In the event there shall be filed a lien against the Land, Premises and/or the Building arising out of a claim against Tenant, its assignees, subtenants, agents, employees, contractors, or invitees by the NJDEP pursuant to the provisions of the Spill Act or by the United States Environmental Protection Agency pursuant to the provisions of CERCLA, Tenant shall immediately either: (i) pay the claim and remove the lien from the Premises and/or the Building; or (ii) furnish a bond, cash receipt, or other security satisfactory to the Landlord sufficient to discharge the claim out of which the lien arises.

(c)     Landlord hereby agrees to indemnify, defend, save, and keep Tenant, and Tenant's officers, principals, shareholders, partners, employees, successors, and assigns, harmless from and against any and all liabilities, obligations, charges, losses, damages, penalties, claims, actions, and expenses, including without limitation, engineers' and professional fees, soil tests, and chemical analysis, court costs, legal fees, and expenses through all trial, appellate, and administrative levels, imposed on, incurred by, or asserted against Tenant as a result of any or in way relating to, arising out of, or in connection with the use, handling, storage, transportation, or disposal of Hazardous Materials by Landlord or its agents, employees, representatives, or contractors in, on, or about the Premises and/or the Building whether same occurred prior to the Lease Date or after the Lease Date. The foregoing indemnification shall survive any assignment or termination of this Lease.

## ARTICLE IX
## PARKING

Landlord agrees to provide Tenant with sufficient parking spaces, including, without limitation, handicapped parking spaces, for Tenant's employees, agents, invitees, customers, and contractors, which shall in no event be less than the number of parking spaces required with respect to the Premises under applicable Laws, and loading docks adjacent to and having direct access to the Premises.  Notwithstanding the above, Landlord shall provide an exclusive parking lot and exclusive parking lot access to the parking lot adjacent to Sections A, B, and C of the Building as shown on Exhibit D. Landlord acknowledges and agrees that Tenant shall have the right to install a gate and a gate lock in the exclusive parking lot area so long as all work complies with section 11.04 of this Lease and Tenant provides Landlord with keys and/or codes for this gate and gate lock.

## ARTICLE X
## SERVICES AND UTILITIES

**Section 10.01 Payment by Tenant for Services and Utilities.** Tenant shall pay, directly to the appropriate supplier, the cost of all natural gas, heat, light, power, sewer service, telephone, water, refuse disposal, and other services and utilities supplied to the Premises. However, if any services or utilities are jointly metered with other portions of the Building or the Building Complex, Landlord shall include such costs in Operating Expenses. If Tenant uses a disproportionate amount of water, Landlord may make an equitable allocation of charges for same and Tenant shall pay its equitable amount as reasonably determined by Landlord, as Additional Rent. Notwithstanding anything to the contrary herein, Tenant acknowledges that Landlord, at its sole cost and expense, may install solar panels on the roof of the Building (the "Solar Panel Project").  Upon completion of the Solar Panel Project, Landlord may, at its option provide power to Tenant directly at cost less five percent (5%) that Landlord pays to the PSE&G (*i.e.* if Landlord is charged ten cents ($0.10) per kilowatt hour (kWhs), Landlord must provide electricity to Tenant at nine and one-half cents ($.095) per kilowatt hour (kWhs)).  Landlord hereby agrees to indemnify, defend, save, and keep Tenant, and Tenant's officers, principals, shareholders, partners, employees, successors, and assigns, harmless from and against any and all liabilities, obligations, charges, losses, damages, penalties, claims, actions, and expenses, including without limitation, court costs, legal fees, and expenses through all trial, appellate, and administrative levels, imposed on, incurred by, or asserted against Tenant as a result of any or in way relating to, arising out of, or in connection with the Solar Panel Project by Landlord or its agents, employees, representatives, or contractors in, on, or about

the Premises and/or the Building whether same occurred prior to the Lease Date or after the Lease Date. The foregoing indemnification shall survive any assignment or termination of this Lease.

**Section 10.02 Interruption of Services and Utilities.** If any of the services or utilities Landlord is required to furnish hereunder are interrupted, Landlord will use reasonable diligence to restore the services or utilities promptly and in such a way that will not unreasonably interfere with Tenant's operations at the Premises, but (except as otherwise provided in this Lease) Tenant will have no claim for rebate of Rent, damages (including damages for business interruption) or eviction on account thereof. Notwithstanding the foregoing, should any service or utility to the Premises be interrupted due to the acts or omissions of Landlord, its agents, contractors, or employees, then if such interruption continues for more than twenty-four (24) hours and causes Tenant to be unable to conduct its normal business operation in the Premises as a result of such interruption, then Basic Rent and any other recurring item of Additional Rent shall be equitably abated from the commencement of said interruption in service until such utility or service is restored provided that Tenant cooperate with Landlord for any and all repair and restoration work required to be undertaken.

## ARTICLE XI
## MAINTENANCE, REPAIRS, AND ALTERATIONS

**Section 11.01 Maintenance by Tenant.** Tenant shall at all times during the Term of this Lease keep the Premises (including maintenance of exterior entrances, all glass and show window moldings and repair of the portion of the Building's roof over the Premises))) and all partitions, doors, doorjambs, door closures, door hardware, fixtures, equipment, and appurtenances thereof that service the Premises (including electrical, lighting, heating, plumbing and plumbing fixtures, and any air-conditioning systems, including leaks around ducts, pipes, vents, or other parts of the air-conditioning, heating, or plumbing systems which protrude through the roof)), in good order, condition, and repair including replacements (if needed). Tenant shall also repair any damages to the structural portions of the roof and the Building resulting from Tenant's grossly negligent acts or intentional omissions or anyone acting by or through or claiming under Tenant as a result of the failure of Tenant or any one claiming under Tenant, and perform or observe the covenants or conditions in this Lease contained or resulting from Alterations, additions, or improvements to the Premises made by Tenant or anyone claiming under or acting by or through Tenant. Tenant shall contract with a local, reputable service company for the maintenance of the HVAC equipment and/or evaporative coolers servicing the Premises, with a copy of the service contract to be furnished to Landlord within Thirty (30) days after the Commencement Date. A copy of any subsequent contracts shall be furnished promptly to Landlord during the Term of this Lease. If Tenant refuses or neglects to furnish a copy of a maintenance contract for the HVAC equipment and/or evaporative coolers, Landlord may contract for such maintenance and shall bill Tenant for the cost, plus Three percent (3%) overhead, and Tenant agrees to reimburse Landlord for the cost within Five (5) Business Days of Landlord's billing, as Additional Rent. Notwithstanding anything contained in this section to the contrary, Tenant shall only be responsible for repair of the portion of the Building's roof over the Premises commencing on the ninth (9th) month after the Commencement Date unless repair is necessitated by Tenant's intentional conduct or gross negligence.  For the avoidance of ambiguity, in the event that the Building's roof requires replacement at any time throughout the Term, Landlord shall be solely responsible for such replacement, which replacement shall be deemed a capital improvement consistent and in compliance with section 4.01(h) of this Lease.

**Section 11.02  Maintenance by Landlord.** If Tenant refuses or neglects to maintain or repair the Premises as required in Section 11.01 of this Lease, then within thirty (30) days after written demand from Landlord, Landlord shall have the option, but not the obligation, to make such repairs without liability to Tenant for any loss or damage that may accrue to Tenant's merchandise, fixtures, or property, or to Tenant's business thereof, and upon completion thereof, and Tenant shall pay Landlord's cost for making such repairs, plus three percent (3%) for overhead, as Additional Rent, within thirty (30) days from receipt of invoice from Landlord. Notwithstanding anything contained in this Lease to the contrary, Landlord, at its sole cost and expense, shall at all times during the Term of this Lease maintain, repair, and replace the exterior walls, all portions of the roof for which Tenant is not responsible  (including the roof membrane), and all structural portions of the Building, and shall periodically paint the exterior walls of the Building from time to time as determined to be necessary by Landlord or its designee, and subject to the obligations of Tenant under the provisions of this Lease. Landlord shall repair and replace plumbing, utility, and/or sewer lines and mains which service the Premises up to the point the lines and mains enter the Premises, at which point Tenant shall be responsible for such maintenance. Landlord, at its sole cost and expense, shall keep, repair, operate, and maintain the following in good order, condition, and repair, and in compliance with all applicable Laws: (a) the foundation, exterior walls, and structural systems, and all portions of the roof of the Building that Tenant is not responsible for and the underground utilities serving the Premises; (b) the electrical, mechanical, plumbing, heating, and air-conditioning systems, facilities, and components located in or adjacent to the Building and/or used in common by all tenants of the Building; (c) the Common Areas (subject to all other terms and conditions of this Lease relating to the Common Areas); (d) those windows, doors, plateglass, and exterior wall surfaces adjacent to the Common Areas; and (e)  the loading docks and parking areas

**Section 11.03  Alterations, Additions, and Improvements.**

(a)      Tenant shall not make any Alterations, additions, or improvements to the Premises without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed, and Landlord must respond within Ten (10) days of receipt of a written request from Tenant; provided, however, Tenant shall not require Landlord's consent for nonstructural Alterations which do not exceed Fifty Thousand 00/100 Dollars ($50,000.00) in cost per project. Landlord may require Tenant to provide demolition and/or lien and completion bonds in form and amount satisfactory to Landlord if the cost of Alterations exceeds Ten Thousand 00/100 Dollars ($10,000). All Alterations, additions, and improvements will be accomplished in a good and workmanlike manner, in conformity with all applicable Laws, and by a contractor (licensed as necessary by the State or municipality) who is registered, bonded, and insured. Prior to commencing  any such work, Tenant, at Landlord's written request, shall provide Landlord with "as-built" plans, and copies of all construction contracts.  Upon completion of any such work, Tenant, at Landlord's written request, proof of payment for all labor and materials. Tenant agrees that Tenant will pay all liens of contractors, subcontractors, mechanics, laborers, materialmen, and other items of like character, and will indemnify Landlord against all expenses, costs, and charges, including bond premiums for release of liens and attorneys' fees and costs reasonably incurred in and about the defense of any suit in discharging the Premises or any part thereof from any liens, judgments, or encumbrances caused or suffered by Tenant. In the event any such lien shall be made or filed, Tenant shall bond against or discharge the same within ten (10)) days after the same has been made or filed or as soon as practicable after Tenant becomes aware of such lien. It is understood and agreed between the parties to this Lease that the expenses, costs, and charges above referred to shall be considered as Additional Rent due and shall be included in any lien for Rent.

(b)      Anything herein to the contrary notwithstanding, Tenant shall provide Landlord prior written notice but shall not be required to obtain Landlord's consent with respect to any painting, decorating, or installation of carpeting within the Premises, installation or relocation of any electrical outlets within the Premises, the removal, reconfiguration, or installation of furniture including any power supply connected thereto, and/or the installation or relocation of low voltage wiring associated with any furniture, fixtures, or equipment installed within the Premises and which are not visible from the outside of the Building provided such electrical work is done by properly licensed electricians and pursuant to such permits if required by law. In no event shall Tenant be required to provide Landlord notice in connection with any cosmetic Alterations. Landlord shall receive no fee for profit, overhead, general conditions, or supervision on any Alterations. Landlord acknowledges and agrees that Tenant shall have the right to self-manage the Alterations, or hire a third party of its choosing.

(c)      All Alterations, additions, or improvements placed on or made to the Premises by Tenant, excluding Personal Property, furniture, trade fixtures, and other movable property not attached to the Building, shall at once become the property of Landlord, and upon termination of this Lease shall be surrendered to Landlord or, at Landlord's option, shall be removed at Tenant's expense. All furniture, Personal Property, trade fixtures, shelves, bins, and machinery installed by Tenant shall be removed by Tenant prior to the expiration or termination of this Lease and all damage to the Premises or the Building caused by the installation or removal of such items shall be repaired at Tenant's expense, prior to (i) the expiration or termination of this Lease and (ii) the final inspection as per paragraph 6(c) above.

### ARTICLE XII
### COVENANT AGAINST LIENS

Nothing contained in this Lease shall authorize or empower Tenant to do any act which shall in any way encumber Landlord's title to the Building, or the Premises, nor in any way subject Landlord's title to any claims by way of lien or encumbrance whether claimed by operation of Law or by virtue of any expressed or implied contract of Tenant, and any claim to a lien upon the Building, or the Premises arising from any act or omission of Tenant shall attach only against Tenant's interest and shall in all respects be subordinate to Landlord's title to the Building, and the Premises. If Tenant has not removed or bonded over any such lien or encumbrance within ten (10) days after written notice to Tenant by Landlord, Landlord may, but shall not be obligated to, pay the amount necessary to remove such lien or encumbrance, without being responsible for making any investigation as to the validity or accuracy thereof, and the amount so paid, together with all costs and expenses (including reasonable attorneys' fees) incurred by Landlord in connection therewith, shall be deemed Additional Rent reserved under this Lease and due and payable within ten (10) days after Tenant's receipt of notice of such payment by Landlord and supporting documentation.

### ARTICLE XIII
### INTENTIONALLY OMITTED

### ARTICLE XIV
### ASSIGNMENT AND SUBLEASING

**Section 14.01 Landlord's Consent Required.** Tenant shall not, directly or indirectly, voluntarily or by operation of Law, sell, assign, encumber, mortgage, pledge, or otherwise transfer or hypothecate all of any part of the Premises, or Tenant's leasehold estate hereunder, or sublet all or any portion of the Premises or permit the Premises to be occupied by anyone other than Tenant (each such act herein referred to as a "**Transfer**"), without Landlord's prior written consent in each instance, which consent shall be in Landlord's sole and absolute discretion. Any attempted Transfer without Landlord's prior written consent shall be void and shall constitute a non-curable breach of this Lease. If Tenant is a partnership or a limited liability company, any cumulative transfer of more than Fifty percent (50%) of the partnership or limited liability company membership interests, as applicable, shall constitute a Transfer and shall require Landlord's consent. Without limiting the foregoing, it shall constitute a Transfer and shall require Landlord's consent if: (a) Tenant is a limited partnership, there is a transfer of a general partner interest; (b) if Tenant is a limited liability company, there is a transfer of any managing membership interest; or if Tenant is a corporation, any change in a controlling interest of the voting stock of the corporation shall constitute a Transfer and shall require Landlord's prior consent.

**Section 14.02 No Release of Tenant.** No Transfer permitted under this Lease, whether with or without Landlord's consent, shall release Tenant or change Tenant's primary liability to pay the Rent and to perform all other obligations of Tenant under this Lease. Landlord's acceptance of Rent from any other person is not a waiver of any provision of this Lease. Consent by Landlord to one Transfer is not consent to any subsequent Transfer. If Tenant's transferee defaults under this Lease, Landlord may proceed directly against Tenant without pursuing remedies against the transferee. Landlord may consent to subsequent Transfers of this Lease by Tenant's transferee, without notifying Tenant or obtaining its consent. Such action shall not relieve Tenant's liability under this Lease. If Tenant transfers Tenant's interest hereunder, then Landlord shall receive, as Additional Rent, the excess, if any, between the rent (or other consideration) paid in connection with such Transfer and the Rent payable by Tenant hereunder.

**Section 14.03 Landlord's Election.** Tenant's request for consent to any Transfer shall be accompanied by a written statement setting forth the details of the proposed Transfer, including the name, business, and financial condition of the prospective transferee, financial details of the proposed Transfer (such as the term of the sublease and the amount of rent and security deposit payable under any assignment or sublease), and any other information Landlord deems relevant. Landlord shall have the right: (a) to withhold consent; (b) to grant consent; or (c) if the Transfer is a sublease of the entire Premises or an assignment of this Lease, to terminate this Lease as of the effective date of such proposed sublease or assignment and enter into a direct lease with the proposed assignee or subtenant.

**Section 14.04 No Merger.** No merger shall result from Tenant's sublease of the Premises, Tenant's surrender of this Lease or the termination of this Lease in any other manner. In any event, Landlord may terminate any or all subtenancies or succeed to the interest of Tenant as sublandlord thereunder.

**Section 14.05 Permitted Transfers.** Notwithstanding the foregoing, Tenant may, without the consent of Landlord make the following Transfers to the following Persons (each a "**Permitted Transfer**" and each a "**Permitted Transferee**"):

(a)      An assignment or sublet of this Lease to any Affiliate of Tenant [or Person] which shall: (i) Control; (ii) be under the Control of; or (iii) be under common Control with Tenant. As used herein, "**Control**" shall mean ownership of more than Eighty percent (80%) of the

outstanding voting stock of a corporation or other majority equity and control interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through the ownership of voting securities, by statute, or according to the provisions of a contract;

(b)     An assignment of this Lease to any entity which is a successor to Tenant either by merger or other consolidation of Tenant;

(c)     An assignment, pledge, or leasehold mortgage on Tenant's interest in this Lease to any bank or banks or other lending institutions for the purpose of securing indebtedness;

(d)     A public offering of Tenant;

(e)     A pledge by any direct or indirect parent of Tenant of its interests in the Tenant;

(f)     A sale of all or substantially all the assets of Tenant or its direct or indirect parent, Affiliate, or a Related Entity;

(g)     Sublet, license, hypothecate all or a portion of the Premises to a third-party or permit the use or occupancy of the Premises (each a "Transfer") provided that:

(i)     Tenant obtains Landlord's prior written consent, which consent may not be unreasonably, withheld, delayed or conditioned provided (i) Tenant shall deliver to Landlord prior written notice of such proposed transfer together with such related information as Landlord shall reasonably request at least 60 days prior to the effective date of any Transfer; (ii) no Event of Default under this Lease shall have occurred and be continuing beyond any and all applicable grace, notice, and cure periods, if any; (iii) the financial worth and creditworthiness of the proposed transferee shall not be less than that of Tenant both as of the date of execution of this Lease and the date of such proposed Transfer, based upon audited financial statements or equivalent financial information, and shall for all other transfer be sufficient to meet the obligations of the applicable sublease; (iv) Tenant shall remain fully liable under this Lease and the transferee shall be jointly and severally liable with Tenant for all such obligations; (v) such transferee (in the event of an assignment) shall agree directly with Landlord to be bound by all of the obligations of Tenant hereunder pursuant to an assumption agreement reasonably satisfactory to Landlord, including, without limitation, the obligation to pay all Rent and other charges due under this Lease. If at any time or from time to time during the Term, Tenant desires to effect a Transfer, Tenant shall deliver to Landlord written notice (a "Transfer Notice") setting forth the terms of the proposed Transfer and the identity of the proposed assignee or subtenant (each, a "Transferee"). Tenant shall also deliver to Landlord with the Transfer Notice an acceptable assumption agreement for Tenant's obligations under this Lease (in the case where the Transfer is a proposed assignment of this Lease) together with all relevant information reasonably requested by Landlord concerning the proposed Transferee to assist Landlord in making an informed judgment regarding the Transferee. Tenant agrees to reimburse Landlord for reasonable accounting and attorneys' fees not to exceed $1,500.00 in total incurred in conjunction with the processing and documentation of any such requested transfer.

(ii)      The Transfer Notice shall be deemed an offer from Tenant to Landlord whereby Landlord (or Landlord's designee) may, at its option, terminate this Lease as to all or the affected portion of the Premises (as the case may be) as of the effective date of the proposed Transfer.  Landlord may exercise its recapture right by notice to Tenant at any time within thirty (30) days after Landlord's receipt of Tenant's Transfer Notice.

(iii)     If Tenant effects any Transfer, then Tenant thereafter shall pay to Landlord a sum equal to (a) the Base Rent, Additional Rent, or any other consideration paid to Tenant by any transferee which is in excess of the Rent then being paid by Tenant to Landlord under this Lease for the portion of the Premises so assigned or sublet (on a pro-rated, square footage basis) , and (b) any other profit or gain (after deducting any necessary expenses incurred) realized by Tenant from the Transfer. All sums payable by Tenant pursuant to this paragraph shall be payable to Landlord as Rent immediately upon receipt by Tenant.

(iv)     Tenant shall not accept, directly or indirectly, more than one (1) month's prepaid rent from any transferee;

(v)      Each Transfer shall provide that the transferee is not to use or permit the use of the premises for any purpose contrary to the provisions of this Lease; and

(vi)     Tenant and Guarantor shall remain primarily liable under this Lease to Landlord, notwithstanding any subletting of the Premises or a portion thereof.

## ARTICLE XV
## INSURANCE AND INDEMNIFICATION

**Section 15.01 Payment of Premiums.** The cost of the premiums for the insurance policies maintained by Landlord shall be an Operating Expense. Premiums for policy periods commencing before and ending after the Term of this Lease shall be prorated.

**Section 15.02 Liability Insurance.** Tenant shall, at Tenant's sole cost and expense, obtain and keep in force during the Term of this Lease commercial general liability insurance (or the equivalent Insurance Services Office Inc. form providing substantially similar coverage in general use from time to time in the State) insuring Landlord and Tenant, and any lender[s] whose names have been provided to Tenant in writing (as additional insureds), against any and all claims for bodily injury and property damage occurring in, or about the Premises arising out of, or in any way related to, the ownership, use, occupancy, or maintenance of the Premises (and all areas appurtenant thereto) by Tenant or its agents, employees, or invitees. Such insurance shall be provided through a combined single limit policy in an amount not less than Five Million 00/100 Dollars ($5,000,000) per occurrence with excess umbrella liability insurance in the amount of Two Million 00/100 Dollars ($2,000,000). If Tenant has other locations that it owns or leases the policy shall include an aggregate limit per location endorsement. The policy shall insure performance by Tenant of the indemnity provision of this Article XV. The limits of said insurance shall not, however, limit the liability of Tenant hereunder. All insurance to be carried by Tenant shall be primary to and not contributory with any similar insurance carried by Landlord, whose insurance shall be considered excess insurance only. In addition, Tenant shall maintain workers' compensation insurance as is required by the Laws of the State.

**Section 15.03  Property Insurance.**

(a)      Landlord shall obtain and keep in force during the Term of this Lease a policy or policies of insurance covering loss or damage to the Building, in the amount of the full replacement value thereof, as the same may exist from time to time, but in no event less than the total amount required by lenders having liens on the Premises, against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, flood (in the event same is required by a lender having a lien on the Building), and special extended perils ("all risk" as such term is used in the insurance industry). Said insurance shall provide for a payment of loss thereunder to Landlord or to the holder of deeds of trust or mortgages on the Premises.

(b)      Tenant shall pay for any increase in the premiums of property insurance obtained by Landlord if said increase is caused by Tenant's acts, omissions, use, or occupancy of the Premises.

(c)      Tenant shall obtain and maintain insurance coverage for full replacement cost on all of Tenant's Personal Property, trade fixtures, and Tenant Improvements in, on, or about the Premises. Such insurance shall be full replacement cost with a deductible not to exceed Ten Thousand 00/100 Dollars ($10,000) per occurrence. Landlord shall not insure Tenant's Improvements or any of its trade fixtures, equipment, or alterations.

**Section 15.04  Rental Insurance.** Tenant shall obtain and keep in force during the Term of this Lease a policy of rental value insurance covering Rent for a period of one year, with loss payable to Landlord. Tenant shall pay the cost of such insurance directly to the insurer and shall provide Landlord proof of such insurance and payment of the premiums therefor.

**Section 15.05  Insurance Policies.** Insurance required hereunder shall be issued by companies licensed to do business in the State and holding a "General Policyholders Rating" of not less than "A," or such other rating as may be required by a lender having a lien on the Building, as set forth in the most current issue of "Best Insurance Guide," or any successor thereto (or if there be none, an organization having a national reputation). No policy carried by Tenant shall be cancelable or subject to reduction of coverage or other modification except after Thirty (30) days prior written notice to Landlord. Not less than Thirty (30) days prior to the expiration of such policies, Tenant shall furnish Landlord with renewals or "binders" thereof, or Landlord may order such insurance and charge the cost thereof to Tenant, which amount shall be payable by Tenant upon demand. Tenant shall not do or permit to be done anything which shall invalidate the insurance policies carried by Landlord. If Tenant does or permits to be done anything which shall increase the cost of the insurance policies referred to in this Article XV, then Tenant shall immediately upon Landlord's demand reimburse Landlord for any additional premiums attributable to any act or omission or operation of Tenant causing such increase in the cost of insurance. Executed copies of policies of insurance or certificates thereof (ACORD Form 28) shall be delivered to Landlord within Five (5) Business Days after the Commencement Date (and with respect to any insurance required under Section 2.04 hereof, prior to the commencement of the Initial Tenant Improvements). If Tenant fails to obtain insurance or deliver to Landlord proof of insurance as required by this Lease, Landlord shall have the option, but not the obligation, to purchase such insurance on behalf of Tenant.  Landlord's exercise of this option shall not limit any of Landlord's' remedies available for default under Paragraph 18 below. In addition, Tenant agrees to reimburse Landlord for all costs incurred in connection with procuring such insurance within Five (5) Business Days of Landlord's billing, as Additional Rent.

**Section 15.06 Waiver of Subrogation.** Tenant and Landlord each hereby release and relieve the other and waive their entire right of recovery against the other for loss or damage arising out of or incident to the perils insured against under this Article XV, which perils occur in, on, or about the Premises, whether due to the negligence of Landlord, Landlord Parties, or Tenant, or any of their agents, employees, contractors, and/or invitees. Tenant and Landlord shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Lease.

**Section 15.07 Indemnity.**

(a)     Tenant shall indemnify and hold harmless Landlord and Landlord's officers, agents, employees, partners, successors, and assigns (collectively, the "**Landlord Parties**") from and against any and all claims arising from Tenant's use of the Premises, or from the conduct of Tenant's business or from any activity, work, or things done, permitted, or suffered by Tenant in, on, or about the Premises or elsewhere, and shall further indemnify and hold harmless all Landlord Parties from and against any and all claims arising from any breach or default in the performance of any obligation on Tenant's part to be performed under the terms of this Lease, or arising from any negligence of Tenant, or any of Tenant's agents, contractors, or employees, and from and against all costs, attorneys' fees, expenses, and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon; and in case any action or proceeding shall be brought against Landlord by reason of any such claim, Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by counsel satisfactory to Landlord..

(b)     Landlord shall indemnify and hold harmless Tenant and Tenant's officers, agents, employees, partners, successors, and assigns (collectively, the "**Tenant Parties**") from and against any and all claims arising from Landlord's use of the Building, or from the conduct of Landlord's business or from any activity, work, or things done, permitted, or suffered by Landlord in, on, or about the Building or Premises or elsewhere, and shall further indemnify and hold harmless all Tenant Parties from and against any and all claims arising from any breach or default in the performance of any obligation on Landlord's part to be performed under the terms of this Lease, or arising from any negligence of Landlord, or any of Landlord's agents, contractors, or employees, and from and against all costs, attorneys' fees, expenses, and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon; and in case any action or proceeding shall be brought against Tenant by reason of any such claim, Landlord, upon notice from Tenant, shall defend the same at Landlord's expense by counsel satisfactory to Tenant.

**ARTICLE XVI**
**DAMAGE AND DESTRUCTION**

**Section 16.01 Partial Damage to Premises.**

(a)     Tenant shall notify Landlord in writing promptly upon the occurrence of any damage to the Premises and, if Landlord is obligated to repair such damage, Landlord shall, within thirty (30) days after such casualty (or, if later, after Landlord's receipt of Tenant's notice of such casualty), deliver to Tenant a good faith estimate (the "**Damage Notice**") of the time needed to repair the damage caused by such casualty. Subject to subparagraph (c) below, if the Premises are only partially damaged and if the proceeds received by Landlord from the insurance policies

maintained by Landlord are sufficient to pay for the necessary repairs, this Lease shall remain in effect and Landlord shall repair the damage as soon as is reasonably possible. Landlord shall not be required to make repairs or replacements of any damage to Tenant's Improvements or to any other fixtures, equipment, Personal Property, or leasehold improvements of Tenant. If the insurance proceeds received by Landlord are not sufficient to pay the entire cost of repair, or if the cause of the damage is not covered by the insurance policies which Landlord maintains, Landlord may elect either to: (i) repair the damage as soon as is reasonably possible, in which case this Lease shall remain in full force and effect; or (ii) terminate this Lease effective as of the date the damage occurred. Landlord shall notify Tenant within Five (5) Business Days after receipt of notice of the occurrence of the damage whether Landlord elects to repair the damage or terminate the Lease. If Landlord elects to repair the damage, Tenant shall pay Landlord the deductible amount (if any) under Landlord's insurance policies, and, if the damage was due to an act or omission of Tenant, the difference between the actual cost of repair and any insurance proceeds received by Landlord. If the damage to the Premises occurs during the last Six (6) months of the Primary Lease Term, or if Tenant is entitled to and properly exercises its Renewal Option in accordance with the terms of Article XXVII of this Lease, the last Six (6) months of the Renewal Lease Term, Landlord may elect to terminate this Lease effective as of the date the damage occurred, regardless of the sufficiency of any insurance proceeds. In such event, Landlord shall not be obligated to repair or restore the Premises and Tenant shall have no right to continue this Lease. Landlord shall notify Tenant of its election within Five (5) Business Days after receipt of notice of the occurrence of the damage.

**Section 16.02  Total or Substantially Destroyed.**

(a)     If the Premises are totally or Substantially Destroyed by any cause whatsoever, or if the Building is Substantially Destroyed (even though the Premises are not totally or Substantially Destroyed), this Lease shall terminate as of the date the destruction occurred regardless of whether Landlord receives any insurance proceeds. The term **"Substantially Destroyed"** shall mean a Eighty percent (80%) destruction of the Premises or Building. Notwithstanding the foregoing, and regardless of whether or not insurance proceeds are available, if the Premises can be rebuilt within Six (6) months after the date of destruction, Landlord may elect to rebuild the Premises at Landlord's own expense, in which case, this Lease shall remain in full force and effect. Landlord shall notify Tenant of such election within Thirty (30) days after the occurrence of total or if Substantially Destroyed. If the destruction was caused by an act or omission of Tenant, Tenant shall pay Landlord the difference between the actual cost of rebuilding and any insurance proceeds received by Landlord.

**Section 16.03  Temporary Reduction of Rent.** If the Premises are destroyed or damaged and Landlord repairs or restores the Premises pursuant to the provisions of this Lease, any Base Rent and Additional Rent payable during the period of such damage, repair, and/or restoration shall be reduced according to the degree, if any, to which Tenant's use of the Premises is impaired. However, the reduction shall not exceed the lesser of the sum of one year's payment of Base Rent and Additional Rent or the proceeds received by Landlord from Tenant's loss of income insurance coverage. Except for such possible reduction in Base Rent and Additional Rent, Tenant shall not be entitled to any compensation, reduction, or reimbursement from Landlord as a result of any damage, destruction, repair, or restoration of or to the Premises.

**Section 16.04 Tenant's Rights**.  Notwithstanding the above, if the Premises are damaged such that Tenant is prevented from conducting its business in the Premises in a manner reasonably comparable to that conducted immediately before such casualty and Landlord estimates that the damage caused thereby for which Landlord is responsible to repair under this Lease cannot be repaired within one hundred eighty (180) days from the happening of such damage (the "Repair Period"), then Tenant may terminate this Lease by delivering written notice to Landlord of its election to terminate within 30 days after the Damage Notice has been delivered to Tenant.  Notwithstanding anything contained herein to the contrary, Tenant shall have no right to terminate this Lease if determined by a licensed engineer or architect, mutually selected by the parties, Tenant caused the casualty.

## ARTICLE XVII
## EMINENT DOMAIN

**Section 17.01 Taking.** Should the Premises or the Building be taken, appropriated, or condemned for public purposes, or voluntarily transferred in lieu of condemnation, in whole or in such substantial part as to render the Building unsuitable for Landlord's purposes or the Premises unsuitable for Tenant's purposes, the Term of this Lease shall, at the option of Landlord in the first instance and at the option of Tenant in the second instance, terminate when Tenant's right to possession is terminated. If neither party exercises this option to terminate within Thirty (30) days after the date of such taking, or if the portion of the Premises or the Building that is taken, appropriated, condemned, or voluntarily transferred in lieu of condemnation does not render the Building unsuitable for Landlord's purposes or the Premises unsuitable for Tenant's purposes, then this Lease shall terminate only as to the part taken or conveyed on the date Tenant shall yield possession, and Landlord shall make such repairs and alterations as may be necessary to make the part not taken usable, and the Rent payable hereunder shall be reduced in proportion to the part of the Premises taken. All compensation awarded for such taking of the fee and leasehold shall belong to and be the property of Landlord without any deduction therefrom for any present or future estate of Tenant and Tenant hereby assigns to Landlord all its right, title, and interest to any such award. However, Tenant shall have the right to recover from the condemning authority, but not from Landlord, such compensation as may be awarded to Tenant on account of interruption of Tenant's business, for moving and relocation expenses, and for depreciation to and removal of Tenant's goods and trade fixtures.

**Section 17.02 Tenant's Right to Terminate.** Notwithstanding the foregoing:

(a)     Tenant shall have the right to terminate this Lease if the condemnation renders the Building unsuitable for Tenant's purposes or if Eighty percent (80%) or more of the Premises is impaired. If Tenant elects to exercise its termination right hereunder, Tenant shall provide written notice thereof to Landlord within Ten (10) days after the condemnation acquisition (or voluntary transfer in lieu of condemnation) has occurred, whereupon this Lease shall be terminated effective as of the date of condemnation acquisition (or voluntary transfer in lieu of condemnation) and neither party shall have any further rights or obligations hereunder (except for any obligations that expressly survive the termination of this Lease).

(b)     Tenant shall be entitled to direct payment by the condemning authority for its interest in this Lease and the Premises for its moving and relocation costs, and any other amount in addition to the foregoing awarded to Tenant by the condemning authority that does not reduce the amount of the award payable to Landlord. If a direct payment is not allowed by applicable local law, the Landlord shall pay Tenant: (i) the portion of the Landlord's award that is attributable

to the value of Tenant's interest and business, as determined by the condemning authority; and (ii) an amount equal to the unamortized portion of any expenditures by Tenant for its improvements or Alternations to the Premises.

(c)     Tenant shall be deemed to have ownership rights in the fixtures to the Premises.

# ARTICLE XVIII
# DEFAULTS AND REMEDIES

**Section 18.01  Covenants and Conditions.** Tenant's performance of each of Tenant's obligations under this Lease is a condition as well as a covenant. Tenant's right to continue in possession of the Premises is conditioned upon such performance. Time is of the essence in the performance of all covenants and conditions.

**Section 18.02  Events of Default.** Tenant shall be in material default under this Lease if any one or more of the following events (herein sometimes referred to individually as an **"Event of Default"** and collectively as **"Events of Default"**) shall occur and shall not be timely remedied as herein provided:

(a)     If Tenant fails to make any payment of Base Rent, or scheduled payments of operating expenses or Real Estate Taxes, or any part thereof, or Additional Rent when and as the same shall become due and payable and such default continues for a period of ten (10) days after receipt by Tenant of notice from Landlord specifying the default due under this Lease or any part thereof when due and such nonpayment continues after ten (10) days' written notice from Landlord, provided that Landlord shall not be required to give such notice and cure period more than two (2) times every calendar year.

(b)     If Tenant fails to observe or perform of any of the other covenants, agreements, or conditions of this Lease on the part of Tenant to be kept and performed, including abiding by the Rules and Regulations, and such default continues for a period of thirty (30) days after written notice thereof from Landlord to Tenant; provided, however, that with respect to any default (other than a default which can be cured by the payment of money) that cannot be reasonably cured within said thirty (30) day period, Tenant shall have an additional period of Thirty (30) day period to cure such default, provided Tenant commences to cure within said thirty (30) days and actually cures the default within Thirty (30) days after Landlord's notice.

(c)     If Tenant files a petition in bankruptcy or is adjudicated as bankrupt, or files any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief for itself under any present or future Law, or makes an assignment for the benefit of creditors, or if any trustee, receiver, or liquidator of Tenant or of all or any substantial part of its properties or of the Premises shall be appointed in any action, suit, or proceeding by or against Tenant and such proceeding or action shall not have been dismissed within  One Hundred and Twenty (120) days after such filing or appointment.

(d)     If Tenant vacates, abandons, or fails to use the Premises for the Permitted Use as stated in Section 7.01 for a period in excess of thirty (30) days except that Tenant shall not be deemed to have abandoned or vacated the Premises when and to the extent that the Premises are

untenantable by reason of damage by fire, other casualty,  or by condemnation, or by Landlord's Default.

(e)      If Tenant's conduct is disorderly and results in destroying the peace and quiet of the Landlord or the other tenants or occupants at the Building, Premises, or in the neighborhood and such conduct continues for a period of thirty (30) days after Landlord gives Tenant written notice thereof.

(f)      If Tenant's willful acts cause destruction, damage, or injury to the Building or Premises.

**Section 18.03  Remedies.** In the event of any Event of Default that is not cured by Tenant within the applicable grace periods set forth in Section 18.02 hereof, Landlord shall have all of the following rights and remedies in addition to all other rights and remedies available to Landlord pursuant to applicable Law or in equity:

(a)      Landlord may charge a late payment fee and other charge at the Interest Rate in accordance with Section 3.03. If Landlord imposes a late charge in connection with any payment which Tenant has failed to make within the time required in this Lease, Tenant shall pay Landlord, in addition to such payment due, the full amount of such late charge. Nothing in this Lease shall be construed as waiving any rights of Landlord arising out of any default of Tenant, by reason of Landlord's imposing or accepting any such late charges, and/or other interest charge at the Interest Rate. The right to collect such late charges and/or interest at the Interest Rate is separate and apart from any rights relating to remedies of Landlord after an Event of Default by Tenant including, without limitation, the rights and remedies of Landlord provided herein.

(b)      To the extent permitted by Law, Landlord may re-enter the Premises and, at the option of Landlord, remove all persons and all or any property therefrom, either by self-help without any duty, requirement, or necessity to provide due process, or to seek a court order by summary dispossess proceedings or any suitable action or proceeding at law or by force or otherwise, without being liable for prosecution or damages therefor, and Landlord may repossess and enjoy the Premises. Upon recovering possession of the Premises by reason of or based upon or arising out of a default on the part of Tenant, Landlord may, at Landlord's option, either terminate this Lease or may relet the Premises for the account of Tenant for such rent and upon such terms as shall be satisfactory to Landlord without thereby releasing Tenant from any liability hereunder and without demand or notice of any kind to Tenant. For the purpose of such reletting Landlord is authorized to make any repairs, changes, alterations, or additions in or to the Premises as Landlord deems reasonably necessary or desirable. Landlord (i) shall not be required to prefer the Premises over any other vacant space which Landlord or Landlord's Affiliates may have; (ii) shall be deemed to be commercially reasonable in considering the relative economic benefit of preferring other space over the Premises; (iii) shall not be required to advertise the Premises to any greater extent than it advertises any other available space; and (iv) shall have no greater obligation with regard to its efforts to mitigate damages than the efforts made by Tenant itself to mitigate damages prior to or after an Event of Default by Tenant. If the Premises are not relet, then Tenant shall pay to Landlord as damages a sum equal to the amount of the rental reserved in this Lease for such period or periods, plus the cost of recovering possession of the Premises (including attorneys' fees and costs of suit), the unpaid Base Rent and other amounts accrued hereunder at

the time of repossession, and the costs incurred in any attempt by Landlord to relet the Premises. In the event of such reletting, all rents received by Landlord from such reletting shall be applied as follows: (A) first, to the payment of any costs and expenses of such reletting, including all costs of alterations and repairs; (B) second, to the payment of any indebtedness other than Base Rent, Additional Rent, or other charges due and unpaid hereunder; (C) third, to the payment of Base Rent, Additional Rent, and other charges due and unpaid hereunder; and (D) forth, the residue, if any, shall be held by Landlord and applied in payment of future Rent as it may become due and payable hereunder. If rentals received from reletting during any month are less than that to be paid during that month by Tenant, Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. No such re-entry or taking possession of the Premises or the making of alterations or improvements thereto or the reletting thereof shall be construed as an election on the part of Landlord to terminate this Lease unless written notice of termination is given to Tenant. Landlord shall in no event be liable in any way whatsoever for failure to relet the Premises or, in the event that the Premises or any part or parts thereof are relet, for failure to collect the rent thereof under such reletting. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach. Therefore, the provisions contained in this Section 18.02(b) shall be in addition to, and shall not prevent the enforcement of, any claim Landlord may have against Tenant for anticipatory breach of this Lease.

(c)     Landlord shall be entitled to damages computed in accordance with Section 18.04 below. Landlord shall also have the right to specific performance (including the right to injunctive relief) of any or all of Tenant's obligations under this Lease and to damages for delay in or failure of such performance.

(d)     Landlord may terminate this Lease and the Term without any right on the part of Tenant to waive the forfeiture by payment of any sum due or by other performance of any condition, term, or covenant broken. In the event Landlord terminates this Lease: (i) Landlord may accelerate and declare the entire remaining unpaid Rent and any and all other monies payable under this Lease for the balance of the Term hereof to be immediately due and payable; and/or (ii) Landlord may collect from Tenant, as liquidated damages: (A) all past due Rent and other amounts due Landlord up to the date of expiration or termination; plus (B) the difference between Rent provided for herein and the proceeds from any reletting of the Premises, payable in monthly installments over the period that would otherwise have constituted the remaining Term of this Lease; plus (C) all expenses in connection with such reletting including, without limitation, all costs, fees, and expenses of repossession, brokers, advertising, attorneys, courts, repairing, cleaning, repainting, and remodeling of the Premises for reletting. Landlord shall have all the rights and remedies for the collection of Additional Rent as are available to Landlord for the collection of the Base Rent pursuant to the terms of this Lease and as permitted by law or in equity. With or without terminating this Lease, Landlord may re-enter and take possession of the Premises and the provisions contained in Section 18.02 shall operate as a notice to quit and, as a result, any other notice to quit or of Landlord's intention to re-enter the Premises are expressly waived by Tenant.

(e)     No right or remedy available to Landlord hereunder or at law or in equity is intended to be exclusive of any other right or remedy provided herein or by law, but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity or by statute.

**Section 18.04  Landlord's Damages.** Where Tenant defaults beyond all applicable grace, notice, and cure periods, regardless of whether Landlord elects to terminate the Lease, notwithstanding re-entry upon the Premises by Landlord, Tenant shall be and remain liable to Landlord in an amount computed as follows:

(a)      An amount equal to the sum of all Rent then in arrears plus the aggregate of all Rent which is payable under this Lease for the balance of the Term, computed as if no Event of Default had occurred and any re-entry had not been made (including, without limitation, Operating Expenses and Real Estate Taxes allocable to Tenant and other Additional Rent that would be owing for the remainder of the Term, as reasonable estimated by Landlord); plus

(b)      All actual, out-of-pocket costs and expenses incurred by Landlord in connection with the Event of Default and any reletting of the Premises, including, without limitation, (i) costs of re-entry, repair, and renovation, (ii) the value of all inducements granted or paid to new tenants of the Premises in connection with reletting including, without limitation, construction allowances and the value of rent-free periods, (iii) brokers' commissions and advertising expenses, (iv) watchman's wages and any sheriff's, marshal's, constable's, or other officials' commissions, whether chargeable to Landlord or Tenant, and (v) reasonable attorneys' fees, costs, and expenses; plus

(c)      Interest accrued at the Interest Rate on the aggregate of the aforesaid sums from the date each was payable (or, with respect to sums owning under clause (b) from the date each was incurred by Landlord) until paid by Tenant (whether before or after judgment); which sum shall be credited with all rentals actually received by Landlord during the remainder of the Term from any replacement tenant which the Premises are relet.

**Section 18.05  Mitigation of Damages**.  To the extent required by applicable Law, Landlord must use commercially reasonable efforts to mitigate Landlord's damages.

## ARTICLE XIX
## PROTECTION OF LENDERS

**Section 19.01  Subordination.**  This Lease and Tenant's rights hereunder are and shall be subordinate and inferior to any ground lease, deed of trust, or mortgage encumbering all or any portion of the Building, any advances made on the security thereof and any renewals, modifications, consolidations, replacements, or extensions thereof, whenever made or recorded. If any ground lessor, beneficiary, or mortgagee elects to have this Lease rank prior to the lien of its ground lease, deed of trust, or mortgage, and gives written notice thereof to Tenant, this Lease shall be deemed prior to such ground lease or mortgage whether this Lease is dated prior or subsequent to the date of said ground lease, or mortgage or the date of recording thereof. The provisions of this Section 19.01 shall be self-operative, and no further instrument shall be required to cause the provisions of this Section 19.01 to be effective.

**Section 19.02  Attornment.**  If Landlord's interest in the Building is acquired by any ground lessor, beneficiary under a deed of trust, mortgage, mortgagee, or purchaser at a foreclosure sale, Tenant shall attorn to the transferee of or successor to Landlord's interest in the Building and shall recognize such transferee or successor as Landlord under this Lease. Tenant waives the protection of any statute or rule

of Law which gives or purports to give Tenant any right to terminate the Lease or surrender possession of the Premises upon the transfer of Landlord's interest.

**Section 19.03  Signing of Documents.** Tenant shall sign and deliver any instrument or documents [necessary or appropriate to evidence any such attornment or subordination or agreement to do so. Such subordination and attornment documents may contain such provisions as are customarily required by any ground lessor, mortgagee, or beneficiary under a ground lease, a mortgage, or a deed of trust. If Tenant fails to do so within Five (5) Business Days after written request, Tenant shall be in default under this Lease and further hereby makes, constitutes, and irrevocably appoints Landlord, or any transferee or successor of Landlord, the attorney-in-fact of Tenant to execute and deliver any such instrument or document.

**Section 19.04  Estoppel Certificates.**

(a)    Upon Landlord's written request, , Tenant shall execute, acknowledge, and deliver to Landlord a written statement certifying: (i) that none of the terms or provisions of this Lease have been changed (or if they have been changed, stating how they have been changed); (ii) that this Lease has not been cancelled or terminated; (iii) the last date of payment of Base Rent, Additional Rent, and any other charges and the time period covered by such payment; (iv) that Landlord is not in default under this Lease (or, if Landlord is claimed to be in default, stating why); and (v) such other matters as may be reasonably required by Landlord or the holder of a mortgage or lien to which the Premises are or become subject. Tenant shall deliver such statement to Landlord within ten (10) days after Landlord's request. Any such statement by Tenant may be given by Landlord to any prospective purchaser or encumbrancer of the Premises. Such purchaser or encumbrancer may rely conclusively upon such statement as true and correct. Unless Landlord has received a written statement to the contrary within such ten (10) day period, Landlord, and any prospective purchaser or encumbrancer, may conclusively presume and rely upon the following facts: (A) that the terms and provisions of this Lease have not been changed except as otherwise represented by Landlord; (B) that this Lease has not been cancelled or terminated except as otherwise represented by Landlord; (C) unless provided otherwise, that not more than one month's Base Rent, Additional Rent, or other charges have been paid in advance; and (D) that Landlord is not in default under the Lease. In such event, Tenant shall be estopped from denying the truth of such facts.

**Section 19.05  Tenant's Financial Condition.** Upon request, Tenant shall deliver to any lender designated by Landlord, from time to time upon request of Landlord, any financial statements required by such lender to facilitate the financing or refinancing of the Premises. Tenant represents and warrants to Landlord that each such financial statement is a true and accurate representation of Tenant's financial situation as of the date of such statement. All financial statements shall be confidential and shall be used only for the purposes set forth herein.

## ARTICLE XX
## WAIVER OF CLAIMS

Tenant agrees that, to the extent not expressly prohibited by Law, Landlord and its lenders, officers, agents, servants, and employees shall not be liable for (nor shall Rent abate as a result of) any direct or consequential damage (including damage claimed for actual or constructive eviction) either to

person or property sustained by Tenant, its subtenants, assigns, officers, servants, employees, agents, invitees, or guests due to the Building or any part thereof or any appurtenances thereof becoming out of repair, or due to the happening of any accident in or about said Building, or due to any act or neglect of any tenant or occupant of said Building or of any other person. This provision shall apply particularly (but not exclusively) to damage caused by water, snow, frost, steam, sewage, gas, electricity, sewer gas, or odors or by the bursting, leaking, or dripping of pipes, faucets, and plumbing fixtures, and shall apply without distinction as to the person whose act or neglect was responsible for the damage and whether the damage was due to any of the causes specifically enumerated above or to some other cause of an entirely different kind. Tenant further agrees that all of Tenant's Improvements, trade fixtures, equipment, and all other Personal Property in the Premises or the Building shall be at the risk of Tenant only, and that Landlord shall not be liable for any loss or damage thereto or theft thereof.  Notwithstanding any of the above, this Article XX does not apply to claims resulting from or related to Landlord's grossly negligent acts, willful acts, or criminal/illegal acts.

## ARTICLE XXI
## WAIVER OF NOTICE

Except as otherwise provided in this Lease, Tenant hereby expressly waives the service of: (a) any notice of intention to terminate this Lease or to re-enter the Premises; (b) any demand for payment of Rent or for possession of the Premises; and (c) any other notice or demand prescribed by any Law.

## ARTICLE XXII
## NOTICES

Unless specifically stated otherwise in this Lease, all notices, waivers, and demands required or permitted hereunder shall be in writing and delivered to the addresses of Landlord and Tenant set forth in the Preamble to this Lease, by one of the following methods: (a) hand delivery, whereby delivery is deemed to have occurred at the time of delivery; (b) a nationally recognized overnight courier company, whereby delivery is deemed to have occurred the Business Day following deposit with the courier; (c) registered United States mail, signature required, and postage-prepaid, whereby delivery is deemed to have occurred on the third day following deposit with the United States Postal Service; or (d) electronic transmission by email provided that the transmission is completed no later than 4:00 p.m. EST or EDT (whatever the case may be) on a Business Day and the original also is sent via overnight courier or United States Mail, whereby delivery is deemed to have occurred at the end of the Business Day on which electronic transmission is completed. Any party shall change its address for purposes of this Lease by giving written notice as provided in this Article XXII and notices shall only be valid if served in the manner provided. All notices and demands delivered by a party's attorney on a party's behalf shall be deemed to have been delivered by said party. For purposes hereof, Landlord's address for electronic transmission is subi@tfxny.com and copies of all notices shall also be delivered to Jonathan Ozarow, Esq., Clark Guldin Attorneys at Law, 20 Church Street, Suite 15, Montclair, NJ 07042, jozarow@clarkguldin.com, and Tenant's address for electronic transmission is hayim@luxeeventrentals.com and copies of all notices shall also be delivered to Kellen F. Murphy, Esq., and Jessica R. Brenner, Esq., Murphy Schiller & Wilkes LLP, 24 Commerce Street, 12th Floor, Newark, NJ 07102, kmurphy@murphyllp.com and jbrenner@murphyllp.com .

## ARTICLE XXIII
## BROKERS

**Section 23.01  Broker's Fee.** Upon the execution and delivery of this Lease by both Landlord and Tenant, Landlord shall pay a real estate commission to Landlord's Broker, as provided in a separate written agreement between Landlord and Landlord's Broker. Landlord's Broker shall pay an appropriate portion of its commission to Tenant's Broker if so provided in an agreement between Landlord's Broker and Tenant's Broker. Nothing contained in this Lease shall impose any obligation on Landlord to pay a commission or fee to any party other than Landlord's Broker.

**Section 23.02  No Other Brokers.** Tenant and Landlord each represent and warrant to the other that Landlord's Broker and Tenant's Broker are the only brokers, agents, finders, or other parties with whom either party has dealt who are or may be entitled to any commission or fee with respect to this Lease or the Premises. Landlord and Tenant each agree to indemnify and hold the other and the other's officers, directors, persons, agents, and representatives harmless from and against any and all liabilities, damages, claims, costs, fees, and expenses whatsoever (including, without limitation, reasonable attorneys' fees and costs at all trial and appellate levels) resulting from any other broker, agent, or other person (other than the Brokers) claiming a commission or other form of compensation by virtue of having dealt with the indemnifying party with regard to this leasing transaction. The provisions of this Section 23.02 shall survive the expiration or other termination of this Lease.

## ARTICLE XXIV
## QUIET ENJOYMENT

Landlord agrees that Tenant, on paying the Rent and other payments herein reserved and on keeping, observing, and performing all of the other terms, covenants, conditions, provisions, and agreements contained in this Lease on the part of Tenant to be kept, observed, and performed, shall, during the Term of this Lease, peaceably and quietly have, hold, and enjoy the Premises subject to the terms, covenants, conditions, provisions, and agreements hereof, free from hindrance by Landlord or any other person claiming by, through, or under Landlord (**"Quiet Enjoyment"**).

## ARTICLE XXV
## END OF TERM

**Section 25.01  Surrender of the Premises.** Upon the expiration or other termination of this Lease, Tenant shall quit and surrender the Premises vacant, broom clean, and in good order and condition, ordinary wear and tear and damage by casualty or condemnation excepted, failing which Landlord may restore the Premises, equipment, and fixtures to such condition and Tenant shall pay the cost thereof upon demand as Additional Rent. All of Tenant's Personal Property, furniture, trade fixtures, shelves, bins, inventory, equipment, and machinery not removed from the Premises when Tenant leaves the Premises upon the expiration or other termination of this Lease shall thereupon be conclusively presumed to have been abandoned by Tenant and immediately become Landlord's property; provided, however, that Landlord may require Tenant to remove such Personal Property, furniture, trade fixtures, shelves, bins, inventory, equipment, and machinery or may have such property removed at Tenant's expense. Landlord may credit the Security Deposit against the amount payable by Tenant under this Article XXV.

**Section 25.02 Holding Over.** Any holding over by Tenant after the expiration or termination of this Lease, by lapse of time or otherwise, shall not operate to extend or renew this Lease except by the express mutual written agreement between Landlord and Tenant, and in the absence of such agreement, Tenant shall continue in possession as a month-to-month tenant only, except that the monthly Rent shall be increased to an amount equal to 200% the monthly installment of Base Rent and Additional Rent paid in the month immediately preceding the expiration or termination of this Lease.

## ARTICLE XXVI
## MISCELLANEOUS PROVISIONS

**Section 26.01 Governing Law; Venue.** The Laws of the State shall govern the validity, performance, and enforcement of this Lease. Tenant consents to personal jurisdiction and venue in the state and judicial district in which the Building is located. The courts of the state where the Building is located will have exclusive jurisdiction and Tenant hereby agrees to such exclusive jurisdiction.

**Section 26.02 Entire Agreement; Waivers.** This Lease forms the entire agreement between Landlord and Tenant and no provision hereof shall be altered, waived, amended, or extended, except in a writing signed by both parties. Tenant affirms that, except as expressly set forth herein, neither Landlord nor any of its agents has made, nor has Tenant relied upon, any representation, warranty, or promise with respect to the Premises or any part thereof. Landlord shall not be considered to have waived any of the rights, covenants, or conditions of this Lease unless evidenced by its written waiver and the waiver of one default or right shall not constitute the waiver of any other. The acceptance of rent shall not be construed to be a waiver of any breach or condition of this Lease.

**Section 26.03 Successors.** The provisions of this Lease shall be binding upon and inure to the benefit of Landlord and Tenant, respectively, and their respective successors, assigns, heirs, executors, and administrators. Tenant agrees to become the tenant of Landlord's successor in interest under the same terms and conditions of its tenancy hereunder.

**Section 26.04 Partial Invalidity.** If any clause or provision of this Lease is found to be illegal, invalid, or unenforceable under present or future laws, the remainder of this Lease shall not be affected thereby and there shall be added as part of this Lease a replacement clause or provision as similar in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and still be legal, valid, and enforceable.

**Section 26.05 Relationship of the Parties.** Landlord and Tenant agree that the relationship between them is that of landlord and tenant and that Landlord is leasing space to Tenant. It is not the parties' intention, nor shall anything herein be constructed to constitute Landlord as a partner or joint venturer with Tenant, or as a "warehouseman" or a "bailee."

**Section 26.06 Headings.** The headings as to the contents of particular paragraphs herein are intended only for convenience and are in no way to be constructed as a part of this Lease or as a limitation of the scope of the particular paragraphs to which they refer.

**Section 26.07 Survival of Obligations.** All obligations of Tenant hereunder not fully performed as of the expiration or earlier termination of the Term of this Lease shall survive the expiration or earlier termination of the Term hereof.

**Section 26.08 Independent Covenants.** Tenant's covenants to pay Rent and other sums due hereunder are independent of Landlord's covenants hereunder and Tenant shall have no right to withhold any such payments on account of any alleged failure by Landlord to perform or comply with any of Landlord's covenants.

**Section 26.09 Additional Rights of Landlord.** In addition to other rights conferred by this Lease or by Law, and as long as it does not render the Premises untenantable, Landlord reserves the right, to be exercised in Landlord's sole discretion, to: (a) change the name of the Building; (b) install and maintain a sign or signs on the exterior or interior of the Building; (c) change the street address of the Building; (d) designate all sources furnishing signs, sign painting, and lettering; (e) take all measures as may be reasonably necessary or desirable for the safety and protection of the Premises, the Building,; (f) have passkeys to the Building; (g) alter, add to, improve, or build additional stories on or built adjacent to the Building; (h) close any skylights or windows; (i) run necessary pipes, conduits, and ducts through the Premises; (j) renovate, refurbish, relocate, or modify the Common Areas; and (k) carry on any work, repairs, alterations, or improvements in, on, or about the Building, or in the vicinity thereof. Tenant hereby waives any claim to damages or inconvenience caused by Landlord's exercise of any such rights. This Section 26.09 shall not be construed to alter or create any obligations of Landlord or Tenant with respect to repairs or improvements or other obligations provided herein.

**Section 26.10 Limitation of Liability.**

(a)     Anything in the Lease to the contrary notwithstanding, any judgment obtained against Landlord in connection with this Lease or the subject matter hereof shall be limited solely to Landlord's interest in the Building, and shall be absolutely nonrecourse with respect to Landlord personally and all other assets of Landlord. Anything in this Lease to the contrary notwithstanding, the term "Landlord" shall be limited to mean and include only the then owner of the Building, or tenant under any underlying or ground lease of the Building, and not any predecessor owner or tenant.

**Section 26.11 Authority.**

(a)     Tenant makes the following representations to Landlord, on which Landlord is entitled to rely in executing this Lease: (i) Tenant is a limited liability company duly organized and existing under the laws of the New York , and is qualified to do business in the State of New Jersey and has the power to enter into this Lease and the transactions contemplated hereby and to perform its obligations hereunder; (ii) by proper resolution the signatory hereto has been duly authorized to execute and deliver this Lease; and (iii) the execution, delivery, and performance of this Lease and the consummation of the transactions herein contemplated shall not conflict with or result in a violation or breach of, or default under Tenant's certificate of formation or bylaws, or partnership or operating agreements, as amended, or any indenture, mortgage, note, security agreement, or other agreement or instrument to which Tenant is a party or by which it is bound or to which any of its properties is subject.

**Section 26.12 Compliance with Laws.** Tenant shall comply at its cost and expense with all Laws, and with any direction or recommendation of any public officer or officers, pursuant to Law, or any reasonable request of any insurance company carrying any insurance on the Premises, and any insurance inspection or rating bureau which shall impose any duty upon Landlord or Tenant with respect to the

Premises or the use or occupation thereof, and shall bear all costs of any kind or nature whatsoever occasioned by or necessary for compliance with the same, provided such costs or expenses arise from Tenant's specific use of the Premises. If, during the Term of this Lease any Law requires that an alteration, repair, addition, or other change be made to the Premises, and such alteration, repair, addition, or other change is a result of Tenant's use of the Premises, such work will be performed at Tenant's expense.

**Section 26.13 Waiver of Jury Trial.** LANDLORD AND TENANT KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY EITHER PARTY AGAINST THE OTHER IN ANY MATTER ARISING OUT OF THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, OR ANY CLAIM OF INJURY OR DAMAGE.

**Section 26.14 No Waiver of Distraint.** Landlord retains any lien right it might have in the machinery, fixtures, and other Personal Property of Tenant, by virtue of Landlord's common law (if any) and statutory right of distraint (N.J.S.A. 2A:33-1 to 2A:33-23) because of failure to pay Fixed Rent and Additional Rent. In the event that any lender or lessee to Tenant requests that Landlord execute any document to waive such right the Tenant shall reimburse Landlord for its reasonable out-of-pocket costs incurred in connection with such request.

**Section 26.15 Counterparts.** This Lease may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original for all purposes, and all such counterparts shall together constitute but one and the same instrument.

**Section 26.16 Memorandum of Lease.** This Lease shall not be recorded in whole or in memorandum form by either party hereto without the prior written consent of the other. At the request of either party, and subject to the reasonable consent of the non-requesting party, Landlord and Tenant may execute a memorandum of lease and record it in the public land records ("**Memorandum of Lease**").

**Section 26.17 Limited Guaranty.** Simultaneously with the execution and delivery of this Lease by Tenant, Tenant shall cause the Limited Guaranty of even date herewith to be executed and delivered to Landlord by Guarantor, Chaim Treitel, in the form attached hereto as Exhibit C. The failure of Tenant to deliver this Personal Guaranty shall not affect the validity of this Lease; however, if the Limited Guaranty is still outstanding as of the Rent Commencement Date, then this shall constitute material default of Tenant hereunder and Landlord shall have all rights and remedies provided in this Lease and at law and in equity

**Section 26.18 Attorneys' Fees.** If any party brings an action or proceeding involving the Premises to enforce the Terms hereof or to declare rights hereunder, the prevailing party shall be entitled to reasonable attorneys' fees from the other Party in any such proceeding, action, or appeal thereon.

**Section 26.19 Patriot Act**.

      (a)      Tenant hereby represents and warrants to Landlord that Tenant: (i) is in compliance with the Office of Foreign Assets Control sanctions and regulations promulgated under the authority granted by the Trading with the Enemy Act, 12 U.S.C. § 95(a) *et seq*., and the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq*., as the same apply to it or its activities; (ii) is in compliance with the Uniting and Strengthening America by Providing

Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time (the "**Patriot Act**") and all rules and regulations promulgated under the Patriot Act applicable to Tenant; and (iii) (A) is not now, nor has ever been, under investigation by any governmental authority for, nor has been charged with or convicted of a crime under 18 U.S.C. §§ 1956 or 1957 or any predicate offense thereunder; (B) has never been assessed a civil penalty under any anti-money laundering laws or predicate offenses thereunder; (C) has not had any of its funds seized, frozen, or forfeited in any action relating to any anti-money laundering laws or predicate offenses thereunder; (D) has taken such steps and implemented such policies as are reasonably necessary to ensure that it is not promoting, facilitating, or otherwise furthering, intentionally or unintentionally, the transfer, deposit, or withdrawal of criminally derived property, or of money or monetary instruments which are (or which Tenant suspects or has reason to believe are) the proceeds of any illegal activity or which are intended to be used to promote or further any illegal activity; and (E) has taken such steps and implemented such policies as are reasonably necessary to ensure that it is in compliance with all laws and regulations applicable to its business for the prevention of money laundering and with anti-terrorism laws and regulations, with respect both to the source of funds from its investors and from its operations, and that such steps include the development and implementation of an anti-money laundering compliance program within the meaning of Section 352 of the Patriot Act, to the extent such a party is required to develop such a program under the rules and regulations promulgated pursuant to Section 352 of the Patriot Act. Neither Tenant nor any other person owning a direct or indirect, legal, or beneficial interest in Tenant is in violation of the Executive Order or the Patriot Act. Neither Tenant nor any of its respective constituents, investors (direct or indirect and whether or not holding a legal or beneficial interest) or affiliates, acting or benefiting, directly or indirectly, in any capacity in connection with Landlord and/or the Building or this Agreement or any of the transactions contemplated hereby or thereby, is: (1) listed in the Annex to, or otherwise subject to the provisions of, that certain Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (the "**Executive Order**"); (2) named as a "specifically designated national (SDN)" on the most current list published by the US Treasury Department Office of Foreign Assets Control at its official website (http://www.treas.gov.ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list or that is named on any other Governmental Authority list issued post 9/11/01; (3) acting, directly or indirectly for terrorist organizations or narcotics traffickers, including those persons that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Financial Action Task Force on Money Laundering, US Office of Foreign Assets Control, US Securities and Exchange Commission, US Federal Bureau of Investigation, US Central Intelligence Agency, US Internal Revenue Service, all as may be amended or superseded from time to time; or (4) owned or controlled by, or acting for or on behalf of, any person described in clauses (1), (2), or (3) above (a "**Prohibited Person**"). None of the funds or other assets of the Tenant constitute property of, or are beneficially owned, directly or indirectly, by any person, entity, or government subject to trade restrictions under US Law, including but not limited to: (x) the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*; (y) The Trading with the Enemy Act, 50 U.S.C. App. 1 *et seq.*; and (z) any Executive Orders or regulations promulgated thereunder, with the result that sale by Tenant or other Persons (whether directly or indirectly), is prohibited by Law (an "**Embargoed Person**"). No Embargoed Person has any interest of any nature whatsoever in Tenant (whether directly or indirectly); and none of the funds of Tenant have been derived from any unlawful

activity with the result that an investment in Tenant (whether directly or indirectly) or sale by Tenant, is prohibited by Law or that execution, delivery, and performance of this Lease or any of the transactions or other documents contemplated hereby or thereby is in violation of Law.

(b)     Landlord hereby represents and warrants to Tenant that Landlord: (i) is in compliance with Patriot Act and all rules and regulations promulgated under the Patriot Act applicable to Tenant; and (ii) (A) is not now, nor has ever been, under investigation by any governmental authority for, nor has been charged with or convicted of a crime under, 18 U.S.C. §§ 1956 or 1957 or any predicate offense thereunder; (B) has never been assessed a civil penalty under any anti-money laundering laws or predicate offenses thereunder; (C) has not had any of its funds seized, frozen, or forfeited in any action relating to any anti-money laundering laws or predicate offenses thereunder; (D) has taken such steps and implemented such policies as are reasonably necessary to ensure that it is not promoting, facilitating, or otherwise furthering, intentionally or unintentionally, the transfer, deposit, or withdrawal of criminally derived property, or of money or monetary instruments which are (or which Tenant suspects or has reason to believe are) the proceeds of any illegal activity or which are intended to be used to promote or further any illegal activity; and (E) has taken such steps and implemented such policies as are reasonably necessary to ensure that it is in compliance with all laws and regulations applicable to its business for the prevention of money laundering and with anti-terrorism laws and regulations, with respect both to the source of funds from its investors and from its operations, and that such steps include the development and implementation of an anti-money laundering compliance program within the meaning of Section 352 of the Patriot Act, to the extent such a party is required to develop such a program under the rules and regulations promulgated pursuant to Section 352 of the Patriot Act. Neither Landlord nor any other person owning a direct or indirect, legal, or beneficial interest in Landlord is in violation of the Executive Order or the Patriot Act. Neither Landlord nor any of its respective constituents, investors (direct or indirect and whether or not holding a legal or beneficial interest), or affiliates, acting or benefiting, directly or indirectly, in any capacity in connection with Landlord and/or the Building or this Agreement or any of the transactions contemplated hereby or thereby, is a Prohibited Person. None of the funds or other assets of Landlord constitute property of, or are beneficially owned, directly or indirectly, by an Embargoed Person. No Embargoed Person has any interest of any nature whatsoever in Landlord (whether directly or indirectly); and none of the funds of Landlord have been derived from any unlawful activity with the result that an investment in Landlord (whether directly or indirectly) or sale by Landlord, is prohibited by Law or that execution, delivery, and performance of this Lease or any of the transactions or other documents contemplated hereby or thereby is in violation of Law.

**Section 26.20  Force Majeure.**

(a)     Neither party shall be liable or responsible to the other party, nor be deemed to have defaulted under or breached this Lease, for any failure or delay in fulfilling or performing any obligation under this Lease (except for any obligations to make payments to the other party hereunder),(, when and to the extent such failure or delay is caused by a Force Majeure Event. The failure or inability of either party to perform its obligations in this Lease due to a Force Majeure Event shall be excused for the duration of the Force Majeure Event and extended for a period equivalent to the period of such delay, but not in excess of Ninety (90) days in the aggregate.

Nothing contained in this Section shall excuse either party from paying in a timely fashion any payments due under the terms of this Lease or extend the term of this Lease.

(b)     To the extent either party relies on a Force Majeure Event to delay performance of any obligation hereunder in accordance with Section 26.20 hereof, such party (the "**Noticing Party**") shall give the other party notice within ten (10) days of the commencement of the Force Majeure Event, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. The Noticing Party shall use diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. The Noticing Party shall resume the performance of its obligations as soon as reasonably practicable after the Force Majeure Event ends.

(c)     Notwithstanding the above, Tenant represents, warrants, and covenants that it is in the business of party supply rentals and that Tenant's business operations requires ongoing parties, events, and the like (collectively, "Parties") to be allowed to take place.  If a Force Majeure Event or its effects continue to be present beyond a period of ninety (90) days and Parties cannot take place (such as, but not limited to, an executive order banning public gatherings as a result of a pandemic), Tenant shall have the right to cause termination of this Lease by provide notice to Landlord (the "Force Majeure Termination Notice"). In order for a Force Majeure Termination Notice to be effective, Tenant must (i) vacate the Premises immediately and deliver to Landlord as it is otherwise required at the conclusion of this Lease and (ii) pay a one-time fee equal to six (6) months' Rent then due and owing under the Lease.

## ARTICLE XXVII
## RENEWAL LEASE TERM

**Section 27.01 Renewal Option.** Tenant shall have the right to renew the Term of this Lease ("**Renewal Option**") for One (1) additional term of Five (5) years ("**Renewal Lease Term**") commencing on the day following the expiration of the Primary Lease Term, provided that each of the following occurs:

(a)     Landlord receives notice of the exercise of the Renewal Option ("**Initial Renewal Notice**") not more than twelve (12) and not less than nine (9months prior to the Expiration Date of the Primary Lease Term.

(b)     No Event of Default (beyond any applicable notice and cure period) exists at the time that Tenant delivers its Initial Renewal Notice or at the time Tenant delivers its Binding Renewal Notice.

(c)     The Lease has not been assigned prior to the date Tenant delivers its Initial Renewal Notice or prior to the date Tenant delivers its Binding Renewal Notice.

**Section 27.02  Rent Payable During the Renewal Lease Term.**

(a)     The Base Rent rate payable during the Renewal Lease Term shall equal the greater of: (i) the annual Base Rent payable immediately prior to the commencement of the Renewal Lease Term; and (ii) the then Prevailing Market Rental Rate for the Premises.

(b)     Tenant shall pay Tenant's Share of Operating Expenses and Tenant's Share of Real Estate Taxes for the Premises during the Renewal Lease Term in accordance with Article IV and Article V of this Lease.

**Section 27.03  Binding Renewal Notice/Rejection Notice.**

(a)     Within Sixty (60) days after receipt of Tenant's Initial Renewal Notice, Landlord shall advise Tenant of the applicable Base Rent rate for the Premises during the Renewal Lease Term. Tenant shall, within Thirty (30) days after the date on which Landlord advises Tenant of the applicable Base Rent rate for the Renewal Lease Term, either: (i) give Landlord final binding written notice ("**Binding Renewal Notice**") of the exercise of Tenant's Renewal Option; or (ii) if Tenant disagrees with Landlord's determination of the applicable Base Rent for the Renewal Lease Term, provide Landlord with written notice of rejection ("**Rejection Notice**"). If Tenant fails to provide Landlord with either a Binding Renewal Notice or a Rejection Notice within such Thirty (30) day period, Tenant's Renewal Notice shall be null and void and of no further force and effect.

(b)     If Tenant provides Landlord with a Binding Renewal Notice, Landlord and Tenant shall enter into a Lease Renewal Amendment prepared by the Landlord upon the terms and conditions set forth herein. If Tenant provides Landlord with a Rejection Notice, Landlord and Tenant shall work together in good faith to agree upon the Prevailing Market Rental Rate for the Premises during the Renewal Lease Term. Upon agreement, Tenant shall provide Landlord with a Binding Renewal Notice and Landlord and Tenant shall enter into the Lease Renewal Amendment in accordance with the terms and conditions hereof. Notwithstanding the foregoing, if Landlord and Tenant are unable to agree upon the Prevailing Market Rental Rate for the Premises within Sixty (60) after the date on which Tenant provides Landlord with a Rejection Notice, Landlord and Tenant agree to submit the dispute to binding Arbitration.

(c)     If Tenant is entitled to and properly exercises its Renewal Option, Landlord shall prepare an amendment ("**Lease Renewal Amendment**") to reflect the changes in the Base Rent, the Expiration Date, and other appropriate terms

**Section 27.04  Prevailing Market Rental Rate.** For purposes hereof, "**Prevailing Market Rental Rate**" shall mean the arm's length fair market annual rental rate under renewal leases entered into on or about the date on which the Prevailing Market Rental Rate is being determined hereunder for space comparable to the Premises in the Building and in buildings comparable to the Building in the vicinity of the Building without any consideration for any rent abatements, construction costs, other concessions, and the manner, if any, in which the landlord under any such lease is reimbursed for operating expenses and taxes. The determination of the Prevailing Market Rental Rate shall also take into consideration any reasonably anticipated changes in the Prevailing Market Rental Rate from the time such Prevailing Market Rental Rate is being determined and the time such Prevailing Market Rental Rate will become effective under this Lease.

**ARTICLE XXVIII**
**LANDLORD REPRESENTATIONS AND WARRANTIES**

**Section 28.01 Landlord Representations and Warranties**.  Landlord hereby unconditionally warrants, represents and covenants, to the best of Landlord's knowledge and without inquiry, to Tenant, as of the date hereof as follows.

(a) **Title to the Property**. Landlord owns the Land upon which the Building is located and has good and marketable title of record thereto, free of any liens or encumbrance except for the Permitted Title Exceptions. Landlord's ownership of the Land has never been challenged. No parties other than Landlord are required to execute or consent to this Lease.

(b) **Building Systems**.  As of the Commencement Date, the Building systems, plumbing, electrical, sprinkler, and heating, ventilation and air-conditioning are in working order.

(c) **No Third Party Rights**. There are no options, licenses, leases, rights of first refusal, contracts for the sale of the Premises (including conditional sales agreements) or similar arrangements concerning the Premises other than as are to be entered with Tenant.  Nothing contained herein shall pertain to mortgage encumbering the Land or Building.

(d) **Condemnation**. Landlord has not received any notice or other communication from any governmental unit or other body having the power of eminent domain indicating that any part of the Land or other portion has been, will or may be condemned.

(e) **Assessments: Public Improvements**. No assessments or notice of assessments for public improvements have been made against the Land prior to the date of this Lease which have not been paid, other than impact fees which will be paid by Landlord, and no work has been commenced on new public improvements authorized by ordinances enacted prior to the date hereof which will result in an assessment against the Land.

(f) **Governmental Requirements.** No material violation of any governmental requirements exists with respect to the Premises, and Landlord is not in default and has not been notified of a possible violation with respect to any governmental requirements. The Improvements comply with all applicable governmental requirements and Legal Requirements (as defined below).

(g) **Utility and Municipal Services**. All utility services of sufficient size and capacity necessary for the operation of the Improvements for their intended purposes are available at or within the property line of the Building, including potable water, storm drainage, sanitary sewer, gas, electric, and telephone facilities, and such utilities have been accepted by applicable governmental authorities if required. The Land and Improvements are served by fire, police and ambulance service by the local Governmental Authority.

(h) **Easements; Access**. All easements and rights-of-way required by all governmental authorities and from private parties for the construction of the Improvements and the use and operation of the Premises for its intended purposes (including for all utility services and all access) have been obtained and recorded in the appropriate records of the county in which the Land is located. All off-site roads and public utilities necessary for the full utilization of the Land and Improvements for their intended purposes have been completed, dedicated to the public use, and accepted by the appropriate Governmental Authorities.

(i)      **Uses**. The present and intended uses of the Premises are permitted by, and comply with, all zoning ordinances, subdivision and platting requirements, deed restrictions, other restrictive covenants, licensing requirements, building codes, flood disaster and environmental protection laws, and other Governmental Requirements and Legal Requirements affecting the use or occupancy of the Premises.

(j)      **Flood Plain**. No portion of the Premises is located within any designated flood plain or special flood hazard area, or if the Building is in flood hazard area, Landlord has obtained and will maintain flood insurance coverage for the Premises as otherwise specified herein.

(k)      **No Proceedings**. Landlord has not received notice of any: (i) actions, suits, or proceedings, at law or in equity, pending before any Governmental Authority or arbitrator against or affecting Landlord or involving the Premises; (ii) outstanding or unpaid judgments against the Landlord or the Premises; or (iii) defaults by Landlord with respect to any order, writ, injunction, decree, or demand of any Governmental Authority or arbitrator.

(l)      **Premises Contracts**. To Landlord's best knowledge, all contracts servicing the Premises (if any) have been duly executed by all parties thereto and are in full force and effect. Landlord is not, and to Landlord's best knowledge without inquiry, no other party is, in default, and there exists no event or fact that with the giving of notice, the passage of time, or both, would constitute a default under any said contract.

(m)      **Land**. The Land is not part of a larger tract of land owned by Landlord or any third-party, is not otherwise included under any unity of title or similar covenant with other lands not encumbered by the Lease, and constitutes a separate tax lot or lots with a separate tax assessment or assessments for the Land and Improvements, independent of those for any other lands or improvements.

(n)      **No Transfer**. Landlord has not directly or indirectly conveyed, assigned, or otherwise disposed of or transferred (or agreed to do so) any development rights, air rights, or other similar rights, privileges, or attributes with respect to the Premises, including those arising under any zoning or land use ordinance or other law or governmental requirement.

(o)      **Other Contracts**.  Landlord has made no contract or arrangement of any kind the performance of which by the other party thereto would give rise to a lien or a right to a lien on the Premise.  Nothing contained herein shall pertain to mortgage encumbering the Land or Building.

(p)      **Sale of Premises**. Landlord has not entered into any agreement to sell or to provide any person or organization an option or right to purchase all or any portion of the Premises.

(q)      **Hazardous Materials**. To the best of Landlord's current actual knowledge, no Hazardous Materials (defined above) are present at or about the Premises, and Landlord has received no written notification from any governmental or quasi-governmental authority of any possible violations of any Legal Requirements (defined below) with respect to the Premises. To the best of Landlord's current actual knowledge, Landlord has not conducted any activity on the Premises involving the generation, storage or disposal of Hazardous Materials. To the best of Landlord's current actual knowledge, no portion of the Premises is now being used to treat, store, generate or dispose of Hazardous Materials, excepting for those materials ordinarily and

customarily used, stored, present or handled in the regular operation of the Premises in the ordinary course of business and in compliance with all applicable laws, ordinances, regulations, statutes, rules and restrictions ("Legal Requirements"). Further, to the best of Landlord's current actual knowledge, Landlord has not received written notice of any discharge, spill, or disposal of any Hazardous Materials on, in or under the Premises, and (ii) there are no storage tanks or recognized environmental conditions located on, in or under the Premises.

**Section 28.02  Reserved.**

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

**LANDLORD:**

1735 Jersey Ave LLC

By:_____

Name: jack saadia vp

Title:

**TENANT**:

LUXE LIVING DESIGN, LLC

By: _chaim treitel_____

Name: CHAIM TREITEL

Title: PRESIDENT

10-23-2023

## LIST OF EXHIBITS

**EXHIBIT A – FLOOR PLAN**

**EXHIBIT B – COMMENCEMENT DATE AGREEMENT**

**EXHIBIT C – LIMITED GUARANTY**

**EXHIBIT D – EXCLUSIVE PARKING AREA**

## <u>EXHIBIT A</u>

## FLOOR PLAN



## <u>EXHIBIT B</u>

## COMMENCEMENT DATE MEMO

THIS MEMORANDUM is made and entered into as of _____, 2023 by and between 1735 Jersey Ave LLC, as Landlord and Luxe Living Design, LLC, as Tenant.

RECITALS:

1. Landlord and Tenant are parties to a certain Warehouse Lease Agreement, dated as of January __, 2023 (the "Lease") relating to approximately 167,000 Square Feet in the building located at and known as 1735 Jersey Avenue, North Brunswick, NJ (the "Premises")

2. All capitalized terms not otherwise defined in this Memorandum have the meanings ascribed to them in the Lease.

3. Landlord and Tenant desire certain facts regarding the Lease, including the Commencement Date and the Expiration Date.

ACKNOWLEDGMENTS:

1. The above recitals are incorporated herein by reference.

2. The Commencement Date under the Lease is _____, 2023.

3. The Rent Commencement Date under the Lease is _____, 2023.

4. The Expiration Date under the Lease is _____, 2030.

5. Tenant must exercise its right to renew the Lease, if at all, by notifying Landlord no earlier than _____, 2029 and no later than _____, subject to the terms and conditions of the Lease.

Landlord and Tenant have each caused this Memorandum to be executed and delivered by their duly authorized representatives as of the day and date first written above.  This Memorandum may be executed in counterparts, each of which is an original and all of which constitute one instrument.

LANDLORD:
1735 JERSEY AVE LLC


BY:_____
NAME:
TITLE:


TENANT:
LUXE LIVING DESIGN, LLC


BY:_____
NAME:
TITLE:

<u>**EXHIBIT C**</u>

**LIMITED GUARANTY**

THIS LIMITED GUARANTY ("Guaranty"), dated this __th day of February, 2023, made by _____, having an address at Chaim Trietel ("Guarantor"), to and for the benefit of 1735 Jersey Ave LLC (the "Landlord").

<u>BACKGROUND</u>

A.      On February ___, 2023, Landlord and Luxe Living Design, LLC ("Tenant") entered into a Warehouse Lease (the "Lease Agreement") for the rental of approximately 192,000 Square Feet in the building located at 1735 Jersey Avenue, North Brunswick, NJ  (the "Leased Premises").

B.      Guarantor acknowledges (i) that the actions of Landlord pursuant to the foregoing are for Guarantor's benefit, and that Guarantor will share in the benefits of the Lease Agreement realized by Tenant; (ii) that the Lease Agreement therefore constitutes a direct, material benefit to Guarantor; and (iii) that this Guaranty constitutes a material inducement to Landlord to enter into the Lease Agreement, without which inducement the Lease Agreement would not have been made.

NOW, THEREFORE, for other good and valuable consideration, the receipt of which is hereby acknowledged, and to induce Landlord to enter into the Lease Agreement, and with the foregoing Background incorporated herein by this reference, Guarantor, intending to be legally bound hereby, covenant and agree as follows:

1.      <u>Guaranty</u>.  Guarantor hereby unconditionally and absolutely guaranties as surety the punctual payment when due of any and all Base Rent and Additional Rent (as defined in the Lease Agreement), together with any future indebtedness and liability created, arising under, or evidenced by the Lease Agreement, including but not limited to all renewals, extensions, and modifications thereof, and the due and punctual payment of any other monies, costs, fees and expenses due or which may become due under the Lease Agreement, and the due and punctual performance and observance by Tenant of all of the other terms, covenants, and conditions of the Lease Agreement, whether according to the present terms thereof, at any earlier or accelerated dates as provided therein, or pursuant to any extension of time or to any change or changes in the terms, covenants, and conditions thereof now or at the time hereafter made or granted.  This Guaranty shall be deemed a continuing guaranty of the Lease Agreement.  For such purposes, the terms and provisions of the Lease Agreement are incorporated herein by this reference as if set forth in full.

Notwithstanding anything contained herein to the contrary, during the term of the Lease Agreement, inclusive of any renewal exercised by Tenant, so long as: (a) Tenant shall have given a notice to Landlord stating that Tenant has elected to surrender the Leased Premises ("Surrender Notice"); (b) after Tenant's giving of the Surrender Notice to Landlord, but not later than the date which is One Hundred Twenty (120) days after giving the Surrender Notice, Tenant (i) delivers the keys to the Leased Premises to Landlord, and (ii) surrenders the Leased Premises to Landlord vacant and free of any occupancies or claims of occupancy rights and in the condition required by the terms of the Lease for surrender of possession by Tenant at the expiration of the term of the Lease (the "Release Date"); and (c) Tenant shall have paid all the Base Rent and Additional Rent due and owing to the Landlord under the terms of the Lease Agreement as of the Release Date, then Guarantor's obligation for payment of Rent and its full performance and observance of all covenants, terms, conditions, and agreements of the Lease shall extinguish as of the Release Date.  Guarantor's liability hereunder shall at all times to be limited to and capped at six (6) months of any and all

Base Rent and Additional Rent (as defined in the Lease Agreement) due by Tenant to Landlord.

2.      Guarantor waives diligence, presentment, protest, notice of dishonor, demand for payment, extension of time for payment, notice of non-payment at maturity, and indulgences and notices of every kind, and consents to any and all forbearances and extensions of time of payment of Base Rent or Additional Rent under the Lease Agreement, and to any and all changes in the terms, covenants, and conditions thereof, it being the intention that Guarantor shall remain liable as principal until the full amount of all sums payable under the Lease Agreement shall have been fully paid and until the terms, covenants, and conditions thereof have been performed and observed by Tenant and notwithstanding any act, omission, or thing which might otherwise operate as a legal or equitable discharge of Tenant.

3.      The obligations of Guarantor shall not be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of Tenant, or its estates in bankruptcy, resulting from the operation of any present or future provision of the bankruptcy laws or other similar statute, of from the decision of any court.

4.      Landlord shall have full right, in its sole discretion and without any notice or consent from Guarantor, from time to time and at any time, and without affecting, impairing, or discharging, in whole or in part, the liability of Guarantor hereunder: (a) to make any change, amendment, or modification whatsoever of any of the terms and conditions of the Lease Agreement; (b) to extend, in whole or in part, by renewal or otherwise, and on one or any number of occasions, the time for the payment of any principal or interest or any other amount pursuant to the Lease Agreement or for the performance of any term or condition thereof; (c) to settle, compromise, release, substitute, surrender, modify, or impair, to enforce and exercise, or to fail or refuse to enforce or exercise, any claims, rights, or remedies, of any kind or nature, which Landlord may at any time have against Tenant whether under the Lease or otherwise.

5.      The obligations of Guarantor hereunder are those of a primary obligor, as surety, and are independent of the obligations of Tenant, or its successors and assigns, and are irrevocable.  A separate action or actions may be brought and prosecuted against Guarantor regardless of whether any action is brought against the Tenant or whether the Tenant is joined in any such action or actions.

6.      In the event that Landlord retains or engages an attorney or attorneys to enforce this Guaranty, Guarantor shall reimburse Landlord for all expenses incurred, including all reasonable attorney's fees, expert fees, court costs and disbursements.

7.      Guarantor irrevocably submits to the jurisdiction of the Superior Court of New Jersey, Middlesex County, over any action or proceeding arising out of or relating to this Guaranty, and all claims in respect of such action or proceeding shall be heard and determined in such court, to the extent permitted by law.

8.      Guarantor shall have no right of subrogation whatsoever with respect to any of the indebtedness guarantied hereby or to any collateral securing any such indebtedness unless and until such indebtedness has been pain in full.

9.      This Guaranty shall inure to the benefit of and may be enforced by Landlord and his successors and assigns, and any subsequent holder of the Lease Agreement, and shall be binding upon and enforceable against Guarantor and his estates, heirs, successors and assigns.

10.     This Guaranty shall be governed by, and construed under and in accordance with, the substantive laws of the State of New Jersey, excluding choice of law rules thereof.

11.     GUARANTOR HEREBY WAIVES ANY RIGHT TO REQUEST A TRIAL BY JURY IN ANY LITIGATION WITH RESPECT TO ANY ASPECT OF THE LEASE AGREEMENT OR THIS GUARANTY. GUARANTOR ACKNOWLEDGES THAT HE HAS HAD THE OPPORTUNITY TO CONSULT WITH INDEPENDENT COUNSEL WITH RESPECT TO THIS WAIVER.

[*Intentionally Left Blank*]

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guaranty as of the day and year first above written.

_____

_____

STATE OF NEW _____:

                   : ss

COUNTY OF _____         :

BE IT REMEMBERED that on this ___th day of October 2023, before me, the subscriber, personally appeared _____, the individual named in the within instrument, and thereupon he acknowledges that he signed and delivered the same as his act and deed.

_____

NOTARY PUBLIC

## **PERSONAL INFORMATION SHEET**

Name: _____

Personal Email: _____

SSN: _____

Please attach copy of your driver's license and a personal check marked "VOID."

# EXHIBIT D

## PARKING PLAN

