# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

--------------------------------
Civil Action No.:3:24-CV-06175-MAS-JTQ
PPREF/TP NORTH BRUNSWICK,
INDUSTRIAL LLC, as assignee of
1735 JERSEY AVE LLC,
            Plaintiffs,

                          VIDEOCONFERENCE
                          DEPOSITION OF:
                          CHAIM TREITEL
            vs.
LUXE LIVING DESIGN, INC,
                Defendant.
-------------------------------------
Civil Action No.:3:24-cv-06168-MAS-JTQ

1735 JERSEY AVENUE LLC, and PPREF/TP
NORTH BRUNSWICK INDUSTRIAL LLC, as
assignee of 1735 JERSEY AVE LLC,

            Plaintiffs,
            vs.

LUXE LIVING DESIGN, LLC and CHAIM S.
TREITEL,

            Defendants.
-------------------------------------
April 15, 2026

HUDSON COURT REPORTING & VIDEO   (732) 906-2078

Page 2

        TRANSCRIPT of the testimony of CHAIM
TREITEL in the above-entitled matter, as taken by and
before CELESTE A. WORTHINGTON, a Certified Court
Reporter and Notary Public of the State of New
Jersey, held via Zoom remote videoconferencing
software, on April 15, 2026, commencing at 10:07 a.m.

Page 3

REMOTE APPEARANCES:

FOX ROTHSCHILD LLP
BY:  R. JAMES KRAVITZ, ESQ.
212 Carnegie Center Drive, Suite 400
Princeton, New Jersey 08540

609-896-3600

rkravitz@foxrothschild.com

Attorneys for the Plaintiff PPREF/TP North Brunswick
Industrial LLC, as assignee of 1735 Jersey Ave LLC

TWERSKY PLLC
BY:  AARON TWERSKY, ESQ.
747 Third Avenue, 32nd Floor
New York, New York 10017
212-425-0149
atwersky@twerskylaw.com
Attorneys for the Defendants Luxe Living Design, LLC
and Chaim S. Treitel

CLARK GULDIN ATTORNEYS AT LAW
BY:  JONATHAN A. OZAROW, ESQ.
20 Church Street, Suite 115
Montclair, New Jersey 07042

973-707-5346

jozarow@clarkguild.com

Attorneys for Counterclaim Defendant 1735 Jersey Ave
LLC

ALSO PRESENT:

Andy Zlotnick
Billy Strassman

Page 4

INDEX

| WITNESS | PAGE |
|---|---|
| CHAIM TREITEL | |
| BY MR. KRAVITZ | 9 |
| BY MR. OZAROW | 203 |

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Certificate of Formation for Luxe Living Design Limited | 23 |
| Exhibit 2 | Warehouse Lease | 27 |
| Exhibit 3 | Defendants' Supplemental Objections and Responses to Interrogatories | 41 |
| Exhibit 4 | Limited Guaranty | 64 |
| Exhibit 5 | Commencement Date Memo | 65 |
| Exhibit 6 | Assignment and Assumption of Lease | 74 |
| Exhibit 7 | Tenant Notice Letter | 75 |
| Exhibit 8 | Stipulation of Settlement | 117 |
| Exhibit 9 | Amendment to Stipulation | 120 |
| Exhibit 10 | Amendment to Stipulation | 122 |
| Exhibit 11 | photographs | 125 |
| Exhibit 12 | photograph | 137 |
| Exhibit 13 | Damages Calculation | 141 |

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 153

sure we have a calculation somewhere.

Q.    Okay.  So you could determine what the lost profits would be on the orders lost, correct?

A.    I guess we can, if we have to.

Q.    Okay.  But you haven't done that?

A.    No, this was the straight out, the full orders.

Q.    Okay.  Because for each of those orders that you weren't able to make, there were costs that you avoided by not making -- not delivering or renting the furniture?

A.    Minimal costs, yes.

Q.    Okay.  But you do have a profit margin that you've calculated?

A.    Yes.  I don't know it by heart.

Q.    Okay.

(REQ)        MR. KRAVITZ:  We're going to make a request for the profit margins on orders, particularly the orders lost, and ask that that be produced.

MR. TWERSKY:  Put it in writing.

MR. KRAVITZ:  We'll have it in the transcript as well.

BY MR. KRAVITZ:

Q.    The next item says truck WH rentals

Page 154

$55,599.  Do you see that?

A.    Yes.

Q.    And can you explain what this is?

A.    This is additional trucks, trailers and a yard by the other warehouse that we had to rent to store -- to get the items out and store them since we weren't allowed into the warehouse.

Q.    Okay.  And what proof do you have that these rentals were the result of the lockout?

A.    You were given all the bills.

Q.    Okay.  And what type of trucks did you rent?

A.    Rented trucks from Ryder, from Enterprise.  We had trailers from a company and then we rented a yard from the other landlord.

Q.    And then the next item is overtime labor for 69,000.  Do you see that?

A.    Correct.

Q.    How did you calculate that?

A.    Our percentage of labor is usually between 30 and 35 percent based on revenues.  I believe we looked at the two weeks prior and the two weeks after and this was I think that week was 45 or 50 percent, I don't remember exactly, and that's the amount, the percentage time the revenue of the week.

Page 155

Q.    Okay.  So to determine overtime labor you have to look at, one of the components of it is looking at the revenue?

A.    Our labor amount is a percentage of revenue, yes, of how many orders we do.

Q.    Okay.  And have you provided that information?

A.    Yes.  We were given -- I believe you were given all paychecks and I believe you were also given the calculation.

Q.    Okay.  I'm going to show you the subsidiary ledgers that you produced.  This is the wrong one.  Let me just take you off share.

Okay.  So I'm going to show you a series of spreadsheets.  What we'll do is mark each one separately.  The first one is a spreadsheet that it just says overtime labor, 16,000.  Do you see that?

MR. TWERSKY:  No, you're not sharing the screen.

A.    No, there is nothing shared.

Q.    Oh, I'm sorry.

MR. KRAVITZ:  We're going to mark this as Exhibit 14.

(Treitel Exhibit 14, tab marked labor,

Page 156

was deemed marked for identification.)

Q.    Okay.  So is there an underlying backup calculation for this?

A.    I believe it was sent to you.

MR. KRAVITZ:  Okay.  The next one it says orders you could not take totaling $95,000.  We're going to mark this as Exhibit 15.

MR. TWERSKY:  You're marking each tab and separate exhibits?

MR. KRAVITZ:  Yeah, I think that may be easier.

(Treitel Exhibit 15, tab marked orders you couldn't take, was marked deemed for identification.)

Q.    And do you recognize this document?

A.    Yes.

Q.    Okay.  And what evidence do you have that you couldn't take this -- these orders because of the lockout?

A.    We supplied you with the invoices.

Q.    Okay.  So were invoices issued before you deliver the rental materials?

A.    Yes, the invoices are issued and paid by the --

Q.    Did you have a contract with your

Pages 153 to 156

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 157

customers?

A. Yes.

Q. Okay. Have you produced the contracts?

A. I believe you have received them.

(REQ)    MR. KRAVITZ: We're going to make a request for the contracts. If they have been produced, then I'm sure I'll be informed of that.

Q. Let me go to the next item.

A. The rental agreement I'm saying.

Q. Correct.

The next item says -- this is the summary of the trucks during the lockout.

A. Correct.

Q. Okay.

MR. KRAVITZ: This will be 16.

(Treitel Exhibit 16, tab marked truck and space rental, was deemed marked for identification.)

Q. Were you able to access the property at all during the lockout?

A. At times, yes, at times, no.

Q. Okay. Who was stopping you from accessing the property?

A. The moving trucks, security guards, goons, whoever the landlord decided to hire. At one

Page 158

point the electric was shut off.

Q. How long did it last?

A. I believe it started on a Tuesday or a Wednesday and it went through the weekend.

Q. Okay.

MR. TWERSKY: Are you going to identify Exhibit 17 or --

MR. KRAVITZ: I think the last one I have is 16.

MR. TWERSKY: Okay.

MR. KRAVITZ: Okay. I'm going to show you another one in a second.

Q. Okay. And these are -- this document I'm showing you is -- it contains -- appears to be agreements with Ryder rental trucks?

A. Correct. Those are the trucks that we rented to move product into.

Q. And it's your contention that you rented these trucks during the lockout period to store goods?

A. Yes. If you look at the rental dates, it coincides with the lockouts.

Q. Okay. And where did the furniture come from that you were storing?

A. The warehouse.

Page 159

Q. So you took it out of the warehouse and put it in a truck?

A. Put it in trucks, trailers and the -- yes.

Q. Okay. And this is an invoice from -- is this your other landlord for --

A. This is our other landlord that we rented a space from for a few days.

Q. As part of -- this is I'll make this Exhibit 17.

MR. KRAVITZ: This is all 17, a packet of documents starting with Ryder leases.

(Treitel Exhibit 17, Ryder leases, was deemed marked for identification.)

Q. Okay. The next document I want to show you we're going to mark it as Exhibit 18. And these are the rental invoices to the clients?

A. Okay.

Q. Am I correct?

A. Nothing is appearing.

MR. KRAVITZ: Someone said something. I couldn't hear what they said.

A. There is no document.

Q. Oh, I'm sorry.

Page 160

Okay. I'm showing you it's approximately 81 pages and I'll represent it's a series of -- appears to be rental invoices to customers whose name and addresses are blacked out. Do you see that?

A. Correct. Yes.

(Treitel Exhibit 18, rental invoices, was deemed marked for identification.)

Q. Okay. And do you recall when the lockout was?

A. End of September.

Q. Okay. And these are all invoices that are after the lockout, correct?

A. That's the pickup update.

Q. October 6th, is that when you take the furniture back?

A. Correct. If you move up to the delivery date. I believe Saturday was the --

Q. The delivery date was October 3rd, a Thursday, and the pickup is on the 6th. So I mean this was over a weekend, the last weekend of September 2024?

A. I believe so.

Q. Okay. So, I guess, number one, why is this particular invoice something that was

Pages 157 to 160

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 161

discounted, so to speak, due to the lockout, if the rental took place after the lockout was over?

A.    Scroll down so I can see what the reason was, where it was or whatever.

Q.    I'm going to just page through the whole thing.

(Document scrolled.)

Q.    There is a 20 percent discount on stock items.  Do you see that?

A.    That's the understanding that the discount that the client gets.  The credit on account is the credit because of the issues with items.  I believe this was an out-of-state delivery to Texas based on what if I had tickets, hotels, things like that.  I don't know the location, which means that it left during the lockout.  Probably had to leave two or three days prior.

Q.    Can you repeat that?

A.    That this an out-of-state delivery if it has tickets, hotel, those type of things.  That means this was out-of-state like far, some are far away and that we could have had to leave two or three days prior.  So we probably had to leave if the delivery was on a Thursday, we probably had to leave on Sunday or Monday.

Page 162

Q.    How can you tell this invoice is discounted?

A.    Because it says credit on account.

Q.    And that's the discount due to the lockout?

A.    Credit, that's what we marked them.

Q.    Okay.  How do you know that this was discounted due to the lockout?

A.    Because we know what orders had issues.  It wasn't hundreds of orders that had issues.  We kept track as we were giving credits back.

Q.    Okay.  So how would we determine that this was an out-of-state shipment if you've redacted the address?

A.    We can unredact the delivery location if you want.

(REQ)    MR. KRAVITZ:  Okay. All right. So we'll make a request for unredacted copies of this document.  I believe we have a confidentiality order now, so I can't think of any reason why the whole thing can't be redacted.  So we'll make a request for unredacted copies of these invoices.

Q.    Now, the next invoice is, this one was I guess during the lockout, September 28th and 29th.

A.    Correct.

Page 163

Q.    And how can you determine what the -- it says there is a refund on the Bedford chairs?

A.    Correct.

Q.    Refund on delivery?

A.    Correct.  We were late for the delivery and the chair, we had issues with the chairs.

Q.    Okay.  And what was the issues with the chairs?

A.    I think they were dirty, a bunch of them, and they had the end cushions in whole boxes and we couldn't go through them.  We were just trying to get the orders out.

Q.    So that had nothing to do with the lockout that the chair was dirty?

A.    It definitely did.  We didn't have time to properly clean the items.  We were just trying to get items out of the warehouse.  Normally we pull items out the day before and clean them and prepare them and put on cushions.  We weren't able to do all of that and we couldn't clean items in the trucks.  We didn't have any space to do that.

Q.    Okay.  And the next item --

A.    A lot of time.  We had an hour here and hour there in between we weren't able to get in.

Q.    And you remember that those particular

Page 164

chairs were dirty?

A.    I do remember we had issues with chairs being dirty and the wrong cushions on the Bedford chairs, yes.

Q.    And here is another one that has a discount on two chairs?

A.    Correct, it was missing chairs.

Q.    Okay.  And you attribute that to the lockout?

A.    Yes, because we could not load properly.  Let's summarize.  Any issues that we had done on that weekend on products is attributed to the lockout because we weren't able to load or unload properly.  Save some time here.

MR. KRAVITZ:  Okay.  I'm going to show you the most recent calculation of unpaid rent and unpaid CAM charges.  And we'll mark this as Exhibit 19.

A.    This is not unpaid rents.  You mean unpaid CAM charges.

Q.    Okay.  Or underpaid CAM charges.

So this indicates that --

MR. TWERSKY:  Exhibit 19?

MR. KRAVITZ:  Yes, this will be Exhibit 19.

Pages 161 to 164

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078